IVELISSE BLÁS TOLEDO y OTROS, demandantes y recurridos, *v.* HOSPITAL NUESTRA SEÑORA DE LA GUADALUPE, la FACULTAD MÉDICA DEL HOSPITAL NUESTRA SEÑORA DE LA GUADALUPE, GLORIA SANTAELLA, UNIVERSAL INSURANCE COMPANY y la ADMINISTRACIÓN DEL FONDO DE COMPENSACIÓN AL PACIENTE, demandados y recurrentes los tres últimos; IVELISSE BLÁS TOLEDO ET AL., demandantes y recurridos, *v.* HOSPITAL NUESTRA SEÑORA DE LA GUADALUPE ET AL., demandados, DR. JOSÉ R. HIDALGO e INSURANCE COMPANY OF NORTH AMERICA, demandados y recurrentes; IVELISSE BLÁS TOLEDO y OTROS, demandantes y recurridos, *v.* HOSPITAL NUESTRA SEÑORA DE LA GUADALUPE y la CORPORCIÓN INSULAR DE SEGUROS, demandados y recurrentes; IVELISSE BLÁS TOLEDO y OTROS, demandantes y recurridos, *v.* HOSPITAL DE LA GUADALUPE, DR. FERDINAND MENÉNDEZ y OTROS, demandados y recurrente el segundo; IVELISSE BLÁS TOLEDO y OTROS, demandantes y recurridos, *v.* HOSPITAL NUESTRA SEÑORA DE LA GUADALUPE, DR. FREDERICK A. GONZÁLEZ, GLORIA TANCIN DE GONZÁLEZ, la SOCIEDAD LEGAL DE BIENES GANANCIALES constituida por los anteriores, ANESTHESIA SERVICE III, RESPIRATORY CARE OF PUERTO RICO, INC., GLORIA AYALA, MARÍA LEGUILLOW y OTROS, demandados y recurrentes.

| | | |
|---|---|---|
| *Números:* | RE-89-40 | *Resueltos:* 30 de junio de 1998 |
| | RE-89-43 | |
| | RE-89-44 | |
| | RE-89-45 | |
| | RE-89-48 | |

270

274

*Jorge L. Suárez Montes, Elí B. Arroyo,* abogados de Dra. Gloria Santaella y de Universal Insurance Company, el primero, *Harry Viera Villeneuve,* abogado de la Administración del Fondo de Compensación al Paciente, *Harold D. Vicente,* de *Vicente & Cuebas,* abogado del Dr. José R. Hidalgo e Insurance Company of North America, *Luis Berríos Amadeo* y *Francisco J. Silva Salcedo,* de *Cancio, Nadal & Rivera,* y *Brunilda Gutiérrez Kercadó,* de *Martínez, Camacho & Laffitte,* abogados del Hospital Nuestra Señora de la Guadalupe, y *Guillermo Silva Janer,* abogado de Dr. Frederick A. González, Gloria Tancin de González, Anesthesia Service III y Respiratory Care of Puerto Rico, Inc., Gloria Ayala y María Leguillow, recurrentes; *José A. Rivera Mercado, José A. Rivera Cordero* y *José A. Masini Soler,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

I

En marzo de 1980, la Sra. Ivelisse Blás Toledo visitó las oficinas del pediatra Dr. José R. Hidalgo con el propósito de

que éste examinara a su hija Alicia Marie, *de poco más de un año*, en relación con *varias condiciones* de salud que aquejaban a esta última. La niña fue hospitalizada con un diagnóstico de gastroenteritis,([1]) bronconeumonía([2]) bilateral intersticial([3]) y alergia respiratoria. Al cabo de ocho (8) días, la joven paciente fue "dada de alta". Dos (2) semanas más tarde, la niña fue ingresada nuevamente por el mencionado facultativo médico en una institución hospitalaria; esta vez con un cuadro de tonsilitis severa.([4]) Nuevamente fue dada de alta. Desde ese momento, y hasta noviembre de 1981, el doctor Hidalgo brindó tratamiento a la niña por diversos padecimientos e infecciones en las vías urinarias y respiratorias y en el oído derecho.([5]) No obstante el cuadro de enfermedades que presentaba la niña, el doctor Hidalgo consideraba que Alicia era una niña normal para su edad y que su peso era promedio.

Ante la *continua* recurrencia de catarros que presentaba la niña, el doctor Hidalgo *la refirió* al Dr. Ferdinand Menéndez, otorrinolaringólogo,([6]) quien la examinó en el mes de enero de 1981 y determinó que Alicia no necesitaba

---

([1]) La gastroenteritis es una "inflamación del estómago y del intestino". *Diccionario Médico Teide*, España, Ed. Teide, 1988.

([2]) Una bronconeumonía es una "afección caracterizada anatómicamente por la inflamación del parénquima pulmonar y de los bronquios. En general, es secundaria a una afección de las vías respiratorias o a una enfermedad general. Su causa es un microorganismo de naturaleza variable". Garnier y Delamare, *Diccionario de los términos técnicos de medicina,* España, Eds. Norma, 1981.

([3]) *Intersticial* significa "relativo al tejido de sostén (tejido conjuntivo y vasos) que rodea el elemento noble de un órgano". Garnier y Delamare, *op. cit.*

([4]) Una tonsilitis es una "inflamación de las tonsilas o amígdalas provocada por una infección bacteriana o viral. Produce dolor faríngeo, fiebre y dificultad a la deglución. Si no se trata adecuadamente con antibióticos, la tonsilitis de origen estreptocócico puede conducir a una fiebre reumática o a una nefritis". *Diccionario Médico Teide, op. cit.*

([5]) Durante ese período, el doctor Hidalgo atendió a la niña por diversas razones, no solamente para las vacunas rutinarias, sino además para tratamientos por pulmonía, faringitis, sospecha de infección urinaria, infección de las vías respiratorias altas, ronquillo, gastroenteritis aguda e infección del oído derecho. También ordenó que se le realizaran diversas pruebas de laboratorio, incluyendo cultivos de garganta; todos los cultivos resultaron negativos.

([6]) Un otorrinolaringólogo es un médico especialista en las enfermedades del oído, nariz y garganta.

tratamiento o medicamento algunos, pero *advirtió* a la madre de la necesidad de practicarle una operación para extirpar las amígdalas y adenoides si la tonsilitis recurría. A su vez, el doctor Menéndez determinó que Alicia no era alérgica a ningún medicamento. En junio del mismo año, el doctor Hidalgo *refirió nuevamente* a Alicia al doctor Menéndez, quien, luego de examinarla, programó una operación en el Hospital Nuestra Señora de la Guadalupe (en lo sucesivo el Hospital) para el mes de octubre con el propósito de removerle a la niña sus amígdalas y adenoides. La operación fue suspendida en dos (2) ocasiones *por órdenes del doctor Hidalgo*; ello en vista de que la niña presentaba problemas de salud.[7] La operación se programó, finalmente, para el 16 de noviembre de 1981; no fue hasta el mismo día de la operación que el doctor Menéndez volvió a examinar a Alicia.

Varios días antes de la operación, la señora Blás Toledo visitó al doctor Hidalgo, quien le entregó un documento denominado *medical clearance* para ser firmado por ella antes de la operación. El tribunal de instancia concluyó que el doctor Hidalgo "falsificó" la fecha del documento debido a que, conforme se indica en la sentencia, el referido documento sólo podía ser otorgado un día —veinticuatro (24) horas— antes de la operación.[8] El tribunal sentenciador determinó, adicionalmente, que el doctor Hidalgo llenó una hoja de consulta con información que correspondía al doctor Menéndez, y firmó por éste.[9] Además, el antiguo Tribunal Superior concluyó, a base de la prueba pericial,

---

[7] La operación fue suspendida en dos (2) ocasiones porque la niña presentaba síntomas de gastroenteritis aguda, inflamación en las vías respiratorias altas, catarro y otitis media.

[8] El documento en cuestión aparece firmado el 15 de noviembre de 1981, pero el mismo fue preparado y firmado por el doctor Hidalgo el sábado 14 de noviembre del mismo año.

[9] Según indica el foro de instancia, el doctor Hidalgo entregó este documento a la señora Blás Toledo para que ésta, a su vez, lo entregara en el Hospital al hacer la preadmisión. El documento referente a la alegada consulta entre el doctor Hidalgo y el doctor Menéndez fue preparado exclusivamente por el doctor Hidalgo, llenando éste aun aquellos incisos o apartados que le correspondían al doctor Menéndez.

*que al momento de otorgarse el "medical clearance" el doc-*
*tor Hidalgo conocía que Alicia no reunía los requisitos mí-*
*nimos indispensables para ser operada de las amígdalas y*
*de las adenoides.*([10]) Determinó también que hasta ese mo-
mento no había mediado comunicación alguna entre los
doctores Hidalgo y Menéndez con respecto al caso de Alicia
y, particularmente, con relación a la operación.

El domingo 15 de noviembre de 1981, Alicia fue ingre-
sada en el Hospital, donde la señora Blás Toledo firmó los
documentos necesarios para prestar su consentimiento a la
operación. Ese mismo día se le realizó a Alicia un examen
médico completo por el "doctor" Roberto Bengoa, asistente
médico (*medical clerk*), quien formuló un diagnóstico de
tonsilitis y adenoiditis.([11]) No obstante, y sin que hubiera
realizado examen alguno a Alicia, la hoja del historial co-
rrespondiente al examen hecho ese día está firmada por el
doctor Menéndez, como *attending physician.*([12]) Según se-
ñala el foro de instancia, en la sentencia que emitiera, no
medió explicación razonable para esta incongruencia.([13])

---

([10]) El propio doctor Hidalgo reconoció ante el tribunal que en el Tratado de
Nelson, en su opinión "la Biblia en pediatría", se establecen los criterios para deter-
minar si procede o no la remoción de las amígdalas a un niño. Confrontado con el
texto, *admitió* que Alicia Marie *no* reunía los criterios mencionados en dicho tratado.
Véase Vaugham, McKay y Behrman, *Nelson Textbook of Pediatrics*, 11va ed., Fila-
delfia, Ed. Saunder Co., 1979.

([11]) El "doctor" Roberto Bengoa había sido contratado por el Hospital como mé-
dico, *pero no tenía licencia para practicar la Medicina ni en Puerto Rico ni en el
extranjero.* Éste había tomado la primera parte de los exámenes de reválida *pero
había fracasado.* Su función en el Hospital consistía en hacer los historiales y exá-
menes físicos de los pacientes recluidos en el tercer y quinto pisos. Además, en do-
mingos alternos, hacía los exámenes pertinentes a los pacientes que se someterían a
cirugía al día siguiente. Esta intervención con los pacientes la hacía sin supervisión
alguna de un médico debidamente autorizado a ejercer la medicina en Puerto Rico.

([12]) En su testimonio ante el foro de instancia, el "doctor" Roberto Bengoa ad-
mitió que la hoja en que tomó el historial y consignó el examen físico que realizó a
Alicia Marie Santos Blás, estaba fechada del domingo 15 de noviembre de 1981.
También admitió que ese día *no* vio *ni* se comunicó con el doctor Menéndez en refe-
rencia a esta paciente. Sin embargo, la hoja del récord médico aparece firmada por el
doctor Menéndez en su capacidad de *attending physician.*

([13]) Al testificar ante el foro de instancia, el doctor Menéndez no pudo explicar
satisfactoriamente la incongruencia en esa hoja del historial. Según se indica en la
sentencia del antiguo Tribunal Superior, de la prueba surge que el doctor Menéndez
no visitó la paciente ni la examinó el domingo 15 de noviembre.

Ese mismo día, el Dr. Frederick J. González visitó a la pequeña paciente para hacer la evaluación preanestesia y se identificó con Ivelisse Blás como el anestesiólogo que atendería a la niña al día siguiente durante la operación. Sin embargo, *no* pudo examinar a Alicia porque ésta se encontraba dormida.

Aproximadamente a las 8:00 A.M. del día siguiente, 16 de noviembre, Alicia Marie —mientras lloraba y llamaba a su mamá— fue conducida a la sala de operaciones mientras su señora madre permanecía en la sala de espera. Fue recibida frente al quirófano B por la enfermera anestesista, María Leguillow, quien la llevó ante la anestesióloga Dra. Gloria M. Santaella. En el quirófano B se encontraban en ese momento: la enfermera anestesista Gloria Ayala de Ferrer, la doctora Santaella, una enfermera "instrumental" y una enfermera "circulante". Según determinó el tribunal de instancia, las enfermeras circulante e instrumental eran empleadas del Hospital, mientras que el resto del personal de sala de operaciones, es decir, las enfermeras anestesistas Ayala y Leguillow y la anestesióloga, doctora Santaella, componían el equipo de anestesia y eran empleadas del Dr. Frederick J. González.[14]

La señora Leguillow colocó a la niña en la mesa de operaciones y recibió instrucciones de la doctora Santaella para comenzar con la preparación e inducción de la niña. Dicho procedimiento consistió en colocarle unos electrodos para el rastreo electrocardiográfico (E.K.G.), a fin de poder observar y determinar a través de un monitor el ritmo del corazón. Además, se le colocó a la paciente un estetoscopio "pericordial" para la auscultación constante del corazón y

---

[14] Para 1981, y aún desde antes de esa fecha, entre el Hospital y el Dr. Frederick González existía un contrato, mediante el cual este último era el responsable de proveer todos los médicos anestesiólogos y las enfermeras anestesistas para los servicios de anestesia del Hospital. El propio Dr. Frederick González testificó sobre la existencia del contrato de exclusividad con el Hospital, aclarando que, salvo en casos excepcionales, solamente a él y a los médicos anestesiólogos contratados por él se les permitía dar anestesia en ese Hospital. Véase la Determinación de Hecho Núm. 64 de la sentencia de instancia.

los pulmones. Concluida la preparación de la paciente, la doctora Santaella dio instrucciones a la señora Leguillow para comenzar con el procedimiento de anestesia, utilizando una mezcla de halotano[15] al uno por ciento (1%) con noventa y nueve por ciento (99%) de oxígeno.

En el quirófano B la anestesia se administró a través de una máquina modelo "Compact-50", la cual según determinó el tribunal de instancia, era sumamente rudimentaria y, además, presentaba la peculiaridad de que las válvulas o botones de oxígeno y gas nitroso estaban colocados en forma inversa a los de las otras máquinas de anestesia en uso en el resto de los quirófanos. Esto es, donde las otras máquinas tenían la válvula de oxígeno, ésta tenía la de gas nitroso, y viceversa. Según la prueba desfilada en instancia, para producir la mezcla de halotano y oxígeno había que manipular y operar manualmente los botones o válvulas de la máquina. La mezcla se producía en una bolsa especial unida a la máquina, luego pasaba a través de un tubo y se administraba al paciente por medio de una mascarilla, la cual se removía luego a través de un tubo endotraqueal.

Conforme la prueba presentada, cuando la señora Leguillow comenzó a preparar la mezcla, la niña todavía estaba agitada y llorando. Según el testimonio de la anestesióloga, doctora Santaella, ella estimó que "dándole unos cuantos bombazos de anestesia podía tranquilizarla" para hacer una entubación normal. La señora Leguillow siguió operando la máquina de anestesia y puso la mascarilla a la niña, para que ésta inhalara la mezcla. La doctora Santaella, que estaba observando, estimó que la niña había llegado ya a un plano de anestesia que le permitiría comenzar la entubación. Ordenó a la otra enfermera anestesista, señora Ayala, que le "cogiera una vena" a la niña para in-

---

[15] El halotano es un "[p]otente anestésico que se administra por inhalación utilizado para inducir y mantener la anestesia en cualquier tipo de intervención quirúrgica". *Diccionario Médico Teide, op. cit.*

yectarle *anectine* para poder entubar a la paciente.([16]) Alegadamente, la doctora Santaella entregó un angio a la señora Ayala, ésta le inyectó a la niña el referido medicamento y de ahí en adelante el funcionamiento fisiológico de la niña quedó totalmente bajo el control del personal de anestesia del Dr. Frederick González y a merced del equipo o maquinaria disponible en el Hospital.

Transcurridos de cinco (5) a diez (10) segundos luego de inyectado el relajante muscular, se le retiró la mascarilla a través de la cual se le estaba administrando la anestesia. Acto seguido, la señora Leguillow procedió a entubarla, utilizando un laringoscopio con un tubo Murphy Núm. 20 que se conectó directamente a la máquina. Según la prueba testifical y documental, después de la entubación la niña estaba respirando y ventilando normalmente. No obstante, apenas seis (6) minutos después de comenzado el procedimiento de anestesia, la señora Leguillow reportó a la doctora Santaella que los latidos cardíacos de la niña —según los recibía a través del estetoscopio "pericordial"— estaban "un poco apagados" y que la niña se veía pálida y cianótica. La doctora Santaella reaccionó ordenando a la señora Leguillow que se moviera y la dejara a la cabecera de la niña, para hacerse cargo de la situación. Ante la posibilidad de que el problema fuese de profundidad de anestesia, la doctora Santaella manipuló la máquina para eliminar el flujo de halotano y dejó a la niña inhalando oxígeno puro, observándose en el monitor un descenso en los latidos cardíacos de la niña.

A juicio del tribunal sentenciador, todas las declaraciones fueron consistentes en el sentido de que, ante esta situación, la doctora Santaella procedió de inmediato a quitar el tubo endotraqueal y sustituirlo por un tubo Murphy Núm. 18. Según el testimonio de la doctora Santaella, des-

---

([16]) Este medicamento o droga, cuyo nombre científico es sucinilcolina (*succinylcholine chloride*) es un relajante muscular que tiene el efecto de paralizar totalmente el sistema muscular del paciente, en especial, el área de la faringe.

pués de que quitó el tubo a la niña, desapareció la palidez y el monitor reflejó tonos cardíacos normales. Además, según lo declarado por la doctora Santaella, la señora Leguillow y la señora Ayala, una vez la niña recobró el color comenzó a morder el nuevo tubo endotraqueal, lo cual indicaba que estaba despertando. Para evitar que despertara, la doctora Santaella, de su propia mano, *volvió a administrarle* anestesia con halotano y oxígeno a través del nuevo tubo conectado a la máquina. Según determinó el tribunal de instancia, habían transcurrido apenas cuarenta y cinco (45) segundos desde el comienzo de la administración de la segunda anestesia cuando el monitor empezó a reflejar rápidamente cambios cardíacos en la niña, los cuales fueron descritos como "sonidos locos a una velocidad increíble". Simultáneamente, dejaron de percibirse sonidos cardíacos y pulsos por el estetoscopio "pericordial" y la doctora Santaella volvió a desconectar la anestesia y siguió administrando oxígeno puro a la niña.

En ese momento, el Dr. Ferdinand Menéndez, quien había entrado al quirófano mientras la doctora Santaella estaba cambiando el tubo endotraqueal, comenzó a dar masajes cardíacos a la niña. En pleno desarrollo de la crisis, entró al quirófano B la Dra. Antonia Jorge Frías, anestesióloga del grupo del Dr. Frederick González. La doctora Jorge declaró que el día de la operación, a eso de las 8:10 A.M., mientras rondaba las salas de operaciones del Hospital, miró por el cristal de la puerta del quirófano B y pudo observar a la doctora Santaella y al doctor Menéndez trabajando activamente con un paciente. La doctora Santaella se percató de su presencia y le hizo una seña para que entrara. Al entrar al quirófano, la doctora Jorge notó que la paciente estaba cianótica y que el doctor Menéndez le estaba dando masaje cardíaco, mientras la doctora Santaella la ventilaba manualmente con cien por ciento (100%) de oxígeno, pero aún así persistía la cianosis, por lo que entendió que la niña no estaba recibiendo oxígeno. Fue en ese

momento que la doctora Jorge intervino activamente en el proceso de resucitación de la niña y solicitó al doctor Menéndez que detuviera el masaje cardíaco. El monitor siguió reflejando movimientos indicativos de una fibrilación[17] extrema. Luego de determinar que en efecto estaban ante una situación de arresto cardíaco, y no un problema de mal funcionamiento del monitor, la doctora Jorge administró a la niña los medicamentos necesarios para sacarla del arresto cardíaco, volviendo a una supuesta normalidad en cuanto a pulso y respiración.[18]

Mientras la doctora Santaella y el doctor Menéndez manipulaban a la paciente, ordenaron a las enfermeras de la sala de operaciones *que llamaran de emergencia al doctor Hidalgo, pediatra de la niña.* Éstas se trataron de comunicar con el referido doctor a través del sistema de intercomunicación del Hospital y también lo llamaron a su oficina. Como sus esfuerzos resultaron infructuosos, se pidió de emergencia la asistencia de *cualquier pediatra* que estuviera en el Hospital. A este llamado acudió la pediatra Dra. Edna Zayas quien, al llegar al quirófano B, se percató de que la doctora Santaella, el doctor Menéndez y la doctora Jorge estaban aún atendiendo a la niña. La doctora Jorge le explicó lo sucedido y mencionó los medicamentos

---

[17] *Fibrilación* es el "latido rápido, irregular e inconexo de numerosas fibras musculares cardíacas con incapacidad para que el corazón mantenga una contracción sincrónica efectiva. La parte correspondiente del corazón cesa de bombear la sangre". *Diccionario Médico Teide, op. cit.*

[18] Según se indica en la sentencia dictada por el antiguo Tribunal Superior, la doctora Jorge admitió haber firmado la hoja de anestesia que forma parte del expediente médico de la paciente Alicia Marie Santos Blás —hoja que también está firmada por la doctora Santaella— pero cualificó su aprobación de dicha hoja a partir del momento en que entró a la sala de operaciones B, que fue a las 8:10 A.M., cuando ya había surgido la crisis. Sin embargo, en opinión de la doctora Jorge, existía una serie de incongruencias inexplicables entre la gráfica demostrativa del proceso de anestesia y los comentarios explicativos de la gráfica. Reconoció una grave incongruencia en cuanto al pulso de la paciente, pues según la gráfica y los comentarios, mientras la niña tenía doscientos diez (210) pulsaciones por minuto, se le había administrado adrenalina. También indicó que de la gráfica no surgía el paro cardíaco que sufrió la niña. Finalmente, informó que revisó y firmó la hoja de anestesia en la tarde del mismo día cuando la doctora Santaella se la entregó ya preparada y le pidió que la firmara.

que se le habían administrado a la paciente. Luego de que la niña comenzara a recobrar la respiración, la siguieron ventilando manualmente con oxígeno puro. Pasada la crisis, las doctoras Santaella y Zayas ordenaron trasladar a la niña al área de recuperación adyacente. *Allí, la doctora Zayas la continuó atendiendo en espera de que llegara su pediatra, el doctor Hidalgo.*

Mientras en el quirófano B ocurrían los eventos antes relatados, la Sra. Ivelisse Blás Toledo, por instrucciones del doctor Menéndez, había permanecido en el recibidor frente al área de sala de operaciones. Ésta, al notar que la operación demoraba más tiempo del indicado por el doctor Menéndez, comenzó a preocuparse. Su temor se acrecentó al ver entrar y salir de la sala de operaciones a enfermeras y personal médico, incluyendo al Dr. Frederick González. Según indica el foro de instancia, ella se inquietó y se aterrorizó al oír las llamadas por el altavoz, solicitando pediatras para una emergencia. Preguntó, pero nadie pudo ofrecerle información alguna sobre lo que estaba sucediendo. A eso de las 10:00 A.M., el Dr. Ferdinand Menéndez se acercó a Ivelisse y le informó que su hija se había puesto "malita". Ivelisse le solicitó de inmediato que llamara al doctor Hidalgo, a lo que el doctor Menéndez contestó que ya se le había llamado y que estaba próximo a llegar al Hospital. Según determinó el foro de instancia, el doctor Hidalgo se había comprometido con Ivelisse a acudir inmediatamente al Hospital de ello ser necesario o de ser requerida su presencia.

Luego de escuchar al doctor Menéndez, Ivelisse —quien se encontraba sola en el Hospital— irrumpió en llanto y fue hasta un teléfono para llamar a su señora madre, Doña Elba Toledo. Ivelisse intentó llamar a su esposo, pero su estado emocional no se lo permitió, por lo que permaneció sola esperando por su madre en la habitación de la niña. Media hora más tarde llegó doña Elba Toledo quien, al recibir la noticia, también se desesperó y comenzó a llorar. Doña Elba permaneció en la habitación mientras Ivelisse

regresó al área cercana a la sala de operaciones con el propósito de obtener más información sobre la condición de su hija. Estando allí llegó su esposo, Luis Nieves Piñeiro, y momentos después el padre de la niña, Luis Santos Colón,[19] quien había sido llamado por las enfermeras del propio Hospital.

Pasado el medio día, un enfermero informó a los familiares de la niña que a las 3:00 de la tarde Alicia Marie sería trasladada a la sala de cuidado intensivo del Hospital. En vista de esta situación, todos ellos permanecieron en el área con la esperanza de poder ver a la niña cuando fuese trasladada. Mientras tanto, en la sala de recuperación, la doctora Santaella y la doctora Zayas dieron órdenes especiales al personal regular del Hospital y al personal adicional —designado por el Dr. Frederick González— para que se mantuviera una observación continua de la condición de la niña y se le tomase la presión arterial y todos los signos vitales. Según surge de los autos, estas órdenes *no* fueron cumplidas estrictamente, debido a que, en esa dependencia del Hospital, *no* estaba disponible el equipo necesario —equipo para tomar la presión arterial a niños— y, *además*, el personal no era el adecuado para atender la condición que presentaba Alicia.

En horas de la tarde, la niña fue trasladada del área de recuperación a la unidad de cuidado intensivo, donde los padres y demás familiares de Alicia Marie pudieron verla, por primera vez, desde que ocurrió el incidente y se percataron de que la niña estaba conectada a "sueros, tubos y mangas por la nariz".[20] Mientras éstos esperaban en la

---

[19] Ivelisse Blás Toledo y Luis Santos Colón estuvieron casados desde junio de 1977 hasta febrero de 1981. Durante su matrimonio procrearon a la menor Alicia Marie Santos Blás.

[20] Hasta ese momento, alrededor de las 4:00 de la tarde, no se le había ofrecido a los familiares explicación de clase alguna sobre lo acontecido y la condición de la niña, excepto lo dicho por el doctor Menéndez a Ivelisse a los efectos de que "la niña se había puesto malita". Por su parte, el doctor Hidalgo aún no se había presentado al Hospital, ello empece a las varias llamadas de las enfermeras y del propio doctor Menéndez.

antesala de la unidad de cuidado intensivo, la doctora Santaella se les acercó, se identificó y les informó que la niña se había puesto "malita", pero que sólo era cuestión de esperar de veinticuatro (24) a cuarenta y ocho (48) horas hasta que la niña saliera de la anestesia. En ese momento, Ivelisse volvió a solicitar la presencia del doctor Hidalgo, a lo que ésta le informó que ya había ordenado a las enfermeras que se comunicaran con él.

Horas más tarde del mismo día, la doctora Santaella volvió a informar a los familiares de la niña que era cuestión de esperar y añadió que se había solicitado una consulta con un neurólogo pediátrico. *Además*, les aseguró que había solicitado al Hospital que consiguiera el equipo necesario para tratar a la niña, *pero que este equipo aún no había sido recibido.* Informó, también, que ella personalmente había llamado al doctor Hidalgo, quien, hasta ese momento, *no* se había personado al Hospital *ni* se había comunicado con los padres de la menor, los médicos *o* el personal del Hospital. Ese mismo día, en horas de la noche, el doctor Stella Arrillaga, neurólogo no pediátrico, informó a Ivelisse Blás Toledo que había examinado a su hija y que ésta no tenía daño cerebral, por lo que era cuestión de esperar unas cuarenta y ocho (48) horas.[21]

No fue hasta temprano en la mañana del día siguiente, 17 de noviembre, que el doctor Hidalgo acudió al

---

[21] Según indica el foro de instancia, surge del récord médico que el doctor Stella Arrillaga examinó a la niña a las 10:30 A.M., es decir, a pocas horas de ocurrido el incidente en el quirófano B. Fue llamado a la sala de recuperación debido a que la paciente estaba inconsciente después de administrársele anestesia y de haber fibrilado. El doctor Stella encontró que la niña convulsaba y que las pupilas estaban contraídas y sin reacción a la luz. La impresión diagnóstica fue de edema cerebral que con mayor probabilidad era secundaria a anoxia cerebral transitoria. Hizo la siguiente anotación en el récord:

"Call to see patient at recovery room —due to unconsciousness after anesthesia started and fibrillation. On exam —patient having seizure Gran Mal type —Eyes— pinpoint pupils non-reactive to light —absent corneal reflex Bilaterally— Eyes in Primary Position.

"S/P Brain Edema Most Probably Secondary to transitory Brain Anoxia." Caso Núm. RE-90-43, Sentencia del Tribunal Superior, pág. 54.

Hospital.[22] Estando el doctor Hidalgo en el Hospital, Ivelisse Blás le pidió que examinara a la niña en la unidad de cuidado intensivo. Ante su requerimiento, *el doctor Hidalgo manifestó que esa era la segunda vez que le pasaba un problema anestésico a un paciente suyo en el Hospital de la Guadalupe.* Ivelisse insistió en que, al menos, se comunicara con la pediatra, Dra. Edna Zayas, a lo que el doctor Hidalgo contestó *que no quería mezclarse más en el asunto y se marchó del Hospital.*[23] El doctor Hidalgo *jamás* volvió a ver a Alicia Marie y sólo supo de ella a través de una conversación personal que sostuvo con el doctor Menéndez tres (3) o cuatro (4) meses antes de que se le tomara una deposición en 1984.[24]

El 18 de noviembre de 1981, en horas de la mañana, la doctora Edna Zayas se acercó a Ivelisse Blás y a sus familiares y les informó que se habían hecho arreglos *para trasladar a Alicia Marie al Hospital Pediátrico Universitario.* La doctora Zayas adujo *como justificación* para el traslado que en el Hospital Pediátrico *tenían las facilidades adecuadas y el personal idóneo para atender un caso como el de Alicia Marie.* El traslado se efectuó en una ambulancia en la que, además de la niña, viajaron la doctora Zayas y una enfermera. Una vez llegaron al Hospital Pediátrico, la niña fue ingresada de inmediato a la sala de cuidado intensivo. Allí fue atendida por espacio de una semana, al

---

[22] El doctor Hidalgo accedió a ello luego de que el Sr. Frankie Blás, hermano de Ivelisse Blás Toledo y quien lo conocía personalmente por ser el pediatra de sus hijos, se comunicara con su oficina y luego le visitara personalmente en compañía del Sr. Luis Nieves, para suplicarle que fuese al Hospital a ver a la niña.

[23] Cabe señalar que en el curso de su testimonio, el doctor Hidalgo admitió haber tenido problemas con el personal de sala de intensivo del Hospital de la Guadalupe en relación con un incidente similar, al extremo de que en aquella ocasión consideró necesario transferir la paciente al Hospital Pediátrico Universitario. Transcripción de la evidencia (en adelante T.E.) de 4 de diciembre de 1987, págs. 226–232.

[24] En la silla testifical, el doctor Hidalgo manifestó que el doctor Menéndez le había expresado lo siguiente:

"Yo no la llegué a tocar, le dieron el primer cantazo y tuvo una arritmia; la re-entubaron y le dieron el segundo cantazo y ahí se jodió." T.E. de 4 de diciembre de 1987, pág. 292.

cabo de la cual fue trasladada a un cuarto semiprivado en el que permaneció tres (3) semanas adicionales. *No fue hasta que los padres de Alicia Marie fueron entrevistados, para hacer el ingreso de la menor al Hospital Pediátrico Universitario, que éstos se enteraron de que la niña tenía grave daño cerebral irreversible.* Nadie en dicho Hospital Pediátrico se explicaba cómo era posible que en el Hospital de la Guadalupe no les hubiesen informado sobre la grave condición de la niña.

Mientras Alicia Marie estuvo hospitalizada en el Hospital Pediátrico, su padrastro, Luis Nieves, fue adiestrado en la atención, aseo, alimentación y cuidado general de la niña.[25] La alimentación de Alicia Marie se hacía a través de un tubo nasogástrico que le era introducido por la nariz hasta el estómago y cuya adecuada colocación debía ser luego verificada con el uso de un estetoscopio. Ese tubo tenía que ser cambiado tres (3) o cuatro (4) veces al día. Una vez colocado el tubo y verificada su correcta posición, se administraban los alimentos a través del mismo en forma líquida. También se adiestró a Luis Nieves para succionar a la niña —lo cual había que hacer en forma continua—, a darle terapia física tres (3) veces al día y terapia respiratoria. Una vez Ivelisse dio a luz, su esposo la adiestró en estos procedimientos y comenzaron conjuntamente a dar atención diaria a la niña.[26]

Cuando la niña fue dada de alta del Hospital Pediátrico, Ivelisse Blás Toledo *tuvo que renunciar a su trabajo para dedicarse de lleno a la atención de su hija.* Ello trajo como consecuencia que no pudiera continuar pagando la renta de su residencia, pues los ingresos de su esposo eran des-

---

[25] El Sr. Luis Nieves fue seleccionado de entre los otros familiares de la niña ya que había trabajado en un hospital y tenía algunos conocimientos básicos sobre este tipo de cuidado. Ivelisse no fue entrenada inicialmente porque estaba en avanzado estado de embarazo y presentaba síntomas de aborto.

[26] Ivelisse relató al foro de instancia cómo se afectaba emocionalmente cada vez que tenía que realizar el proceso de entubar a su hija, pues ese proceso lastimaba las vías por donde pasa el tubo y la niña se resentía muchísimo.

tinados a los gastos inmediatos de la familia, incluyendo los del cuidado de Alicia Marie. Ante esa situación, los padres de su esposo Luis les ofrecieron la habitación principal de su residencia, la cual utilizaron por unos meses. Luego, sabiendo que Alicia Marie necesitaba unas facilidades especiales y un cuarto para ella sola —con aire acondicionado las veinticuatro (24) horas del día— los padres de Luis construyeron una segunda planta para que Ivelisse y Luis estuviesen independientes y la niña pudiese contar con unas facilidades adecuadas, acorde con las instrucciones médicas.

En vista de que la condición de Alicia Marie no mostraba mejoría, en octubre de 1982 ésta fue examinada por el Dr. Eduardo Mirabal Font, pediatra y neurólogo. El examen físico y neurológico reveló *que la niña sufría de una encefalopatía*[27] *anóxica*[28] *con cuadriplegia*[29] *y con demencia.*[30] En la vista ante el foro de instancia, el doctor Mirabal Font declaró que un paciente saludable y normal que se lleva al quirófano y sale en las condiciones en que salió Alicia Marie *tenía que haber sufrido un "insulto anóxico", relacionado con una oxigenación deficiente en respiración y circulación asociadas con un paro cardíaco.*

---

[27] En la vista ante el foro de instancia, el propio doctor Mirabal Font explicó que el término *encefalopatía* es uno neurológico que indica daño cerebral. T.E. de 15 y 16 de diciembre de 1987, pág. 233.

[28] Según indicó el doctor Mirabal Font, el término "anóxico" fue explicado como uno de etiología a base del historial del caso. T.E. de 15 y 16 de diciembre de 1987, pág. 233.

*Anoxia* es una "situación en la que los tejidos orgánicos reciben una cantidad reducida de oxígeno". *Diccionario Médico Teide, op. cit.*

[29] Aunque la sentencia del antiguo Tribunal Superior señala que el diagnóstico realizado por el doctor Mirabal Font fue de cuadriplegia, esto parece ser un error, pues luego se ofrece para este término la definición correspondiente a la hemiplegia. Ésta, según explicó el propio doctor Mirabal Font, se refiere a la falta de control motor del cerebro sobre el movimiento de las piernas. T.E. de 15 y 16 de diciembre de 1987, pág. 234.

[30] Finalmente explicó que el término "demencia" se refiere a una deficiencia en las funciones cerebrales superiores que impiden a un ser humano hacer juicio, comunicarse y tener contacto con su medio ambiente. La condición está relacionada con una destrucción de la mayor parte de los circuitos en el hemisferio cerebral. T.E. de 15 y 16 de diciembre de 1987, págs. 232–233.

Transcripción de la evidencia (en adelante T.E.) de 15 y 16 de diciembre de 1987, pág. 234. Luego de haberla evaluado, el doctor Mirabal Font determinó que la condición de Alicia Marie le permitiría utilizar los circuitos en el tallo cerebral necesarios para respirar espontáneamente, para mantener presión y temperatura y para tener sus riñones, hígado e intestinos funcionando. *Sin embargo*, aclaró que *no* había evidencia de que la niña estuviese en contacto con su medio ambiente en el sentido de ver y oír. La niña no podía virarse, ni aguantar la cabeza, ni entender lo que se le dijera, ni tampoco podía moverse por sí misma. Íd., págs. 235–236. A pesar de estas condiciones, Alicia Marie sentía estímulos dolorosos de una manera no específica. El doctor Mirabal Font explicó esto con un ejemplo: si se le hincaba con un alfiler, la niña lloraba pero no retiraba la mano o el miembro que era pinchado, pues no podía apreciar qué era lo que le hincaba ni dónde en su cuerpo. Íd., pág. 238.

En consideración de los hallazgos neurológicos, el doctor Mirabal Font le recomendó a los padres de Alicia Marie que la mantuvieran en vigilancia continua y constante, más allá de la que necesitaba un niño normal, ya que estando en una condición tan frágil cualquier enfermedad, por simple que fuese, podría ocasionar consecuencias serias. Además, les indicó que en este tipo de caso de daño cerebral, *no* existe ningún medicamento, tratamiento o procedimiento que mejore la condición. T.E. de 15 y 16 de diciembre de 1987, págs. 240–242.

En vista de lo informado por el doctor Mirabal Font, los padres de Alicia se trasladaron con ésta al Hospital John Hopkins en Baltimore, Maryland, en busca de una "segunda opinión". Estuvieron allí un (1) mes, durante el cual se le hicieron a Alicia evaluaciones neurológicas y pruebas diagnósticas que confirmaron todo el diagnóstico y pronóstico emitido por el doctor Mirabal Font. Para ese viaje, los padres de la niña tuvieron que levantar, de sus ahorros y con algunas aportaciones de familiares y amigos, la suma

de ocho mil setecientos dólares ($8,700), la cual fue utilizada en su totalidad en esa gestión.

Por su parte, el doctor Mirabal Font volvió a examinar a la niña cuando ésta cumplió cuatro (4) años, y luego a los cinco (5) años. La examinó nuevamente dos (2) días antes de su comparecencia a corte como testigo de la parte demandante. En el juicio, testificó que su diagnóstico más reciente era esencialmente el mismo que había formulado cuando examinó a la menor en el año 1982. *En su opinión, la niña no tenía ningún futuro y no tenía posibilidades de mejoría neurológica.* T.E. de 15 y 16 de diciembre de 1987, pág. 253. Manifestó que la expectativa de vida en niños con encefalopatía severa, como la que sufre Alicia Marie, *es de un promedio de veinticinco (25) años.* Consideró que Alicia Marie cae dentro de esa expectativa de vida promedio, debido al grado de excelencia del cuido que está recibiendo de sus padres y familiares. Íd., págs. 255–257. A la fecha de la vista, esa expectativa de vida promedio se había reducido —por el transcurso del tiempo— a diecinueve (19) años.[31]

## II

El 13 de octubre de 1982 se radicó ante la Sala de San Juan del antiguo Tribunal Superior de Puerto Rico la acción civil de daños y perjuicios donde figuran como demandantes Ivelisse Blás Toledo de Nieves, Luis Edgardo Nieves Piñeiro y la Sociedad de Gananciales compuesta por éstos, por sí y en representación de la menor Alicia Marie Santos Blás; Luis A. Santos, por sí y en representación de

---

[31] Al momento de ocurrir el incidente en el quirófano B del Hospital de la Guadalupe, en noviembre de 1981, la niña tenía dos (2) años y nueve (9) meses de edad. Al dictar sentencia en el antiguo Tribunal Superior, la niña tenía nueve (9) años y, según el testimonio pericial, con gran certeza podría sobrevivir diecinueve (19) años más, es decir, hasta aproximadamente la edad de veintiocho (28) años. En su sentencia, el antiguo Tribunal Superior enfatizó que dada la calidad del cuidado que recibe la niña por parte de sus familiares, fácilmente podría cumplir y hasta rebasar su expectativa de vida. A la misma conclusión llegó el doctor Mirabal Font. T.E. de 15 y 16 de diciembre de 1987, pág. 257.

su hija menor Alicia Marie Santos Blás; Efraín Santos Rivera; Elba Toledo y Carmen Iris Piñeiro. En ella alegaron haber sufrido daños como consecuencia de la *impericia médica* del Hospital Nuestra Señora de la Guadalupe, Inc., del Dr. Frederick González, del Dr. Miguel A. Vega, del Dr. José Hidalgo, del Dr. Ferdinand Menéndez, de la doctora Santaella, del Dr. Roberto Bengoa, de la Dra. Antonia Jorge, de la Sra. Gloria Ayala de Ferrer, de la Sra. María Leguillow, sus respectivos cónyuges y todas las sociedades legales de gananciales compuestas por ellos. También se incluyó como demandados al Grupo de Anestesiología "XYZ", a Respiratory Care of Puerto Rico, Inc., y a Ayerst Laboratories (PR), Inc.[32]

Luego de un prolongado pleito en el que se radicaron varias demandas contra coparte, el foro de instancia dictó sentencia, el 28 de noviembre de 1988,[33] mediante la cual impuso responsabilidad a los codemandados Hospital Nuestra Señora de la Guadalupe, Dr. Frederick González, Respiratory Care of Puerto Rico, Inc., Dra. Gloria Santaella, Sra. María Leguillow, Sra. Gloria Ayala de Ferrer —estas tres (3) últimas como empleadas del Dr. Frederick González y Anesthesia Service III— Dr. José R. Hidalgo y Dr. Ferdinand Menéndez.[34] El tribunal de instancia los con-

---

[32] Posteriormente, los demandantes enmendaron su demanda para incluir como demandada a la Dra. Edna Zayas, su esposo, la sociedad legal de gananciales compuesta por éstos y a la Insurance Company of North America, aseguradora del doctor Hidalgo. Tanto el doctor Hidalgo como su aseguradora negaron la negligencia imputada y radicaron demandas de coparte en contra del Hospital, Anesthesia Service III, Respiratory Care of P.R., y de los Dres. Ferdinand Menéndez, Gloria Santaella, Frederick González y Edna Zayas.

[33] Dicha sentencia fue archivada en autos y notificada a las partes el 1ro de diciembre de 1988.

[34] El antiguo Tribunal Superior desestimó la reclamación contra el Dr. Miguel Vega Rolón y su aseguradora por no haberse presentado prueba de negligencia en su contra. También decretó la desestimación de la reclamación en contra de la Dra. Antonia Jorge Frías, porque de la prueba presentada en el juicio no surgía indicio alguno de posible responsabilidad o negligencia de su parte.

Por otra parte, y conforme a estipulación entre las partes, el foro de instancia decretó el archivo de las reclamaciones en cuanto a la Dra. Edna Zayas, su esposo y la sociedad legal de gananciales compuesta por ellos, ya que su acuerdo de transacción quedó aprobado por todas las partes. En cuanto al Dr. Ferdinand Menéndez, la

denó a pagar solidariamente a los demandantes la suma de *dos millones doscientos veinticuatro mil setecientos cuarenta y tres dólares con veintisiete centavos ($2,224,743.27)*.[35] De dicha sentencia han recurrido el Hospital, los doctores Hidalgo, Menéndez y González, la doctora Santaella, sus respectivas compañías aseguradoras y la Administración del Fondo de Compensación al Paciente.[36] *Decidimos revisar.* Ordenamos la extensa transcripción de los procedimientos acaecidos a nivel de instancia. Estando en condiciones de resolver los recursos radicados, procedemos a así hacerlo.[37]

*Debido al gran número de señalamientos de error formulados por los recurrentes, muchos de los cuales giran en torno a un mismo asunto, discutiremos en conjunto aquellos que, por su naturaleza, puedan ser agrupados. Sólo*

---

sociedad legal de gananciales compuesta por éste y su señora esposa, se aceptó un contrato de transacción y, según aclaró la juez de instancia, quedó pendiente la determinación del derecho de nivelación.

Por último, luego de que la parte demandante manifestara al tribunal de instancia su interés de desistir en cuanto a su reclamación contra Ayerst Laboratories, Inc., el foro de instancia dictó sentencia parcial final en la que decretó la desestimación y archivo de la misma.

[35] Desestimó la reclamación del menor Luis Nieves Blás, hermano de la víctima, porque éste no había nacido al momento de ocurrir el accidente. La cuantía concedida a los demandantes fue distribuida por el foro sentenciador, para propósitos de nivelación entre los responsables solidarios, de la siguiente forma: (1) treinta y cinco por ciento (35%) de negligencia al codemandado Hospital; (2) treinta y cinco por ciento (35%), conjuntamente, a los codemandados Dr. Frederick González, Respiratory Care of Puerto Rico, Inc., Dra. Gloria Santaella, Sra. María Legillow y Sra. Gloria Ayala de Ferrer (a estas tres (3) últimas como empleadas del Dr. Frederick González y Anesthesia Service III); (3) veinte por ciento (20%) al codemandado Dr. José Rafael Hidalgo, y (4) diez por ciento (10%) al codemandado Dr. Ferdinand Menéndez.

Se condenó también a todos los antes mencionados a satisfacer solidariamente a la parte demandante todas las costas y gastos de este litigio y a pagar intereses al doce por ciento (12%) desde la fecha de la radicación de la demanda. Se les impuso también a los codemandados el pago de sesenta mil dólares ($60,000) por concepto de honorarios de abogado.

[36] Ante este Foro se han radicado cinco recursos distintos en relación con los hechos que dan lugar a la sentencia de epígrafe. En todos ellos se pide revisión de la sentencia dictada por el antiguo Tribunal Superior el 28 de noviembre de 1988. Los mismos han sido consolidados y se dispone de todos ellos por la presente sentencia.

[37] El 10 de junio de 1992 —mediante Moción Informativa— se nos apercibió del hecho que Alicia Marie había fallecido el 18 de mayo de 1992.

*discutiremos por separado aquellos señalamientos que han sido levantados por tan sólo un recurrente en particular.*

### III ·

*Discusión de errores planteados por el doctor Hidalgo*

En cuanto al pediatra, la parte demandante alegó y el antiguo Tribunal Superior sostuvo que el doctor Hidalgo incurrió en negligencia al: (1) recomendar una operación que no estaba indicada; (2) sugerir facilidades hospitalarias inadecuadas; (3) preparar el *medical clearance* con fecha alterada, y (4) abandonar a su paciente luego de lo ocurrido en la sala de operaciones.[38] El doctor Hidalgo alega la comisión de ocho (8) errores por parte del tribunal sentenciador.[39]

---

[38] El antiguo Tribunal Superior impuso responsabilidad al doctor Hidalgo porque: (1) negligentemente "generó una secuencia de eventos que llevaron a su pacientita ... al quirófano del Hospital ... donde sufrió los daños irreparables"; (2) porque esa "secuencia de eventos se inició con la expedición de una aprobación o *medical clearance* para la intervención quirúrgica para la amígdalas y adenoides, sabiendo que los criterios pediátricos para dicha intervención no estaban presentes y que no se justificaba la misma". Caso Núm. RE-89-43, Sentencia del Tribunal Superior, pág. 102.

[39] El doctor Hidalgo y su aseguradora Insurance Company of North America comparecieron conjuntamente solicitando revisión de la sentencia dictada en su contra el 28 de noviembre de 1988 por el antiguo Tribunal Superior (Hon. Juez Luzgarda Vázquez de Santiago) señalando que el tribunal a quo erró:

*"Primer Error*

"... al declarar con lugar la demanda, e imponer al Dr. Hidalgo un 20% de responsabilidad.

*"Segundo Error*

"... al imponer responsabilidad al Dr. José R. Hidalgo, por no intervenir con el especialista y los padres de la niña para evitar que se llevara a cabo la operación.

*"Tercer Error*

"... al imponerle responsabilidad al Dr. José R. Hidalgo por supuestamente 'abandonar' a la paciente Alicia Marie Santos Blás —después del incidente ocurrido en sala de operaciones— ya que: (i) el abandono *no* ocurrió; (ii) no se dan todos los elementos de una causa de acción por abandono; y (iii) los actos del Dr. Hidalgo con posterioridad al incidence [sic] en sala de operaciones *no* causó daño alguno *ya que el ya* [sic] *daño había sido causado.*

*"Cuarto Error*

"... por imponerle responsabilidad al Dr. Hidalgo por 'no abogar por los derechos de la menor Alicia Marie' evitando así que la niña fuera operada, ya que existe divergencia de criterios entre las autoridades médicas sobre la operación a la cual iba a ser sometida la menor era el tratamiento o procedimiento correcto bajo las

Como *primer error*, señala que el tribunal no debió imponerle un veinte por ciento (20%) de responsabilidad por referir su paciente al doctor Menéndez. Alega que su participación *se limitó* a referir a la niña para evaluación y que no recomendó la operación ni intervino en la decisión de operar, ni sugirió dónde llevar a cabo la operación.[40] También señala que no podía anticipar lo que le ocurriría a la niña al ser anestesiada, ni que los anestesiólogos habrían de incurrir en un acto de negligencia tan craso como el de aplicar anestesia por segunda vez, sin antes determinar qué había causado la primera reacción adversa.[41]

---

circunstancias del caso. (*Pérez Torres* v. *Bladuell Ramos*, 88 JTS 4).

"*Quinto Error*

"... al imponerle el veinte por ciento (20%) de responsabilidad al Dr. Hidalgo —quien no participó en la decisión de operar, ni de dónde operar, ni se encontraba en la sala de operaciones cuando se le administra la anestesia a la menor— mientras que el tribunal le impone al Dr. Menéndez —quien es el que decide operar, escoje el hospital y se encuentra en sala de operaciones cuando se le administra el agente anestésico a la niña— solamente el diez por ciento (10%) de responsabilidad. Esa determinación no representa el balance más racional y justiciero de la evidencia presentada.

"*Sexto Error*

"... al imponerle al Dr. José R. Hidalgo, el pago de honorarios de abogado e intereses al tipo del doce por ciento (12%) anual a partir de la radicación de la demanda y el pago de costas, por concepto de temeridad.

"*Séptimo Error*

"... en las cuantías de daños concedidas a los demandantes por los sufrimientos mentales a la luz del derecho vigente en Puerto Rico.

"*Octavo Error*

"... al declarar sin lugar la desestimación solicitada por el compareciente antes de comenzar la vista en su fondo, y al concluir la prueba de la parte demandante y que luego solicitara mediante moción y violar los [sic] más elementales Reglas de Procedimiento Civil." (Énfasis suplido y en el original.) Caso Núm. RE-89-43, Solicitud de revisión, pág. 12.

[40] Añade que no sólo no intervino en la decisión de operar, sino que tampoco podía intervenir, pues de haberlo hecho, habría dado una opinión en un área de la medicina ajena a su campo de especialidad. Esta alegación resulta evidentemente errónea, pues en primer lugar el pediatra es un especialista en enfermedades de los niños y, en segundo lugar, el propio doctor Hidalgo admitió que existen criterios *pediátricos* para determinar cuándo procede la extirpación de amígdalas y adenoides, y que Alicia Marie no cumplía con los mismos.

[41] El doctor Hidalgo alega que la única causa de los daños sufridos por Alicia Marie (la que con mayor probabilidad los causó) fue la negligencia combinada del Hospital —al mantener en sus salas de operaciones equipo anestésico anticuado y deficiente— y de los anestesiólogos, al proceder por segunda vez con la anestesia sin establecer las causas por las cuales la niña reaccionó adversamente a la primera administración de la misma.

Además, alega que indicó a la madre de la niña que, a su mejor entender, la operación *no* estaba indicada según los criterios esbozados por los textos de pediatría.

En cuanto al *medical clearance,* el doctor Hidalgo alega que, según demuestra la prueba presentada durante la vista ante el foro de instancia, antes de cumplimentar dicho documento o consulta pre operatoria, informó a la madre de Alicia Marie su opinión sobre la operación, pero que aun así, ésta decidió proseguir con la misma. Señala, también, que dicho documento no constituyó una aprobación de la justificación del procedimiento quirúrgico. Añade que el *medical clearance* es tan sólo un documento por el cual el médico primario identifica al cirujano condiciones preexistentes que podrían de alguna manera interferir con el procedimiento quirúrgico al que va a ser sometido el paciente. Por lo tanto, señala que al llenarlo y firmarlo *no* aprobó o ratificó la necesidad o justificación de la *operación*; responsabilidad que, según alega, recae exclusivamente sobre el cirujano.

Como *segundo error,* el doctor Hidalgo señala que el foro de instancia erró al imponerle responsabilidad por no intervenir con el especialista y los padres de la niña para evitar que se llevara a cabo la operación. Sobre el particular, aduce que la prueba demostró que él apercibió a la madre de la niña que esperara y probara un tratamiento conservador.

Por otro lado, señala que, aun cuando el procedimiento quirúrgico pudiera no haber estado indicado, la operación *sí* estaba indicada según el texto de otorrinolaringología de M. Paparella y D. Shumrick, *Otolaryngology,* Filadelfia, Ed. Sanders Co., 1973, Vol. 3. Citando el caso de *Pérez Torres v. Bladuell Ramos,* 120 D.P.R. 295 (1988), nos señala que este hecho le exonera de responsabilidad pues permite que le ampare *la defensa de divergencia de criterios* entre las autoridades médicas. En su *cuarto* señalamiento de error, el doctor Hidalgo plantea que el tribunal

sentenciador no debió imponerle responsabilidad por "no abogar por los derechos de la menor". En su defensa alega que la conclusión del foro de instancia de que la operación de la niña era totalmente innecesaria y que el pediatra de la niña debió haberlo sabido, es errónea.

Por estar íntimamente relacionados entre sí, discutimos conjuntamente el primer, segundo y cuarto señalamientos de error aducidos por el doctor Hidalgo. Comenzamos con el segundo de ellos.

■ Si bien es cierto que, conforme a nuestros pronunciamientos en *Pérez Torres v. Bladuell Ramos*, ante, la existencia de criterios divergentes entre las autoridades médicas exonera de responsabilidad civil al médico que sigue una de las distintas alternativas de acción aceptadas por la profesión, esta defensa sólo ha sido aplicada a diferencias entre autoridades médicas en una misma disciplina o especialidad. Ese *no* es el caso ante nos. *En el caso de autos existen unos criterios pediátricos uniformes y aceptados por todos los peritos pediatras, incluso por el propio doctor Hidalgo, como los criterios correctos en el campo de la pediatría.*

■ Ciertamente, el doctor Hidalgo, como pediatra de la niña, pudo y debió evitar que el doctor Menéndez sometiera a Alicia Marie a una intervención quirúrgica. El doctor Hidalgo sabía, o debió haber sabido, que la niña *no* cumplía con los criterios pediátricos para poder soportar la operación, por lo que al ser expuesta al procedimiento quirúrgico, estaba siendo sometida a un riesgo innecesario. El doctor Hidalgo sabía esto y, aún así, no hizo nada para evitar que la niña fuera expuesta innecesariamente al riesgo de la cirugía. Esta conducta está reñida con una práctica reconocida en la pediatría moderna, a saber, *el pediatra es quien aboga por su paciente y se convierte en su defensor o "advocate".*

Sobre este particular, el Dr. Juan Cárdenas, perito en pediatría presentado por la parte demandante, explicó al

foro de instancia que cuando un pediatra entiende que un paciente no reúne los criterios médicos pediátricos para poder resistir una operación de tonsilectomía y adenodectomía, *es su deber comunicarse con el otorrinolaringólogo a quien ha referido su paciente.* Sostuvo, además, que cuando los médicos no logran armonizar sus criterios, *la mejor práctica de la medicina obliga al pediatra a advertir a los padres del niño que la operación está contraindicada, y* opinó que en tal caso su deber es tratar de convencerlos de evitar la misma. Véase, a estos efectos, la T.E. de 8 de diciembre de 1987, pág. 3 *et seq.*

Por otra parte, el Dr. Frank Rodríguez Martínez, pediatra neumólogo, presentado como perito por el codemandando, doctor Hidalgo, *aceptó que el concepto de "child advocate" está sólidamente reconocido por la Academia Americana de Pediatría.*[42] T.E. de 22, 28 y 29 de diciembre de 1987, pág. 569. Además, indicó que cuando un pediatra refiere un niño a otro médico para que sea evaluado, *debe mantener una comunicación directa con éste, pues esta es la fuente ideal para adquirir conocimiento sobre la consulta solicitada.* Finalmente, informó al tribunal que *no* constituye buena práctica de la medicina dar un *medical clearance* con una fecha errónea y firmar una hoja de consulta en la forma y manera en que lo hizo el doctor Hidalgo. Íd., pág. 578.

Indudablemente, bajo las circunstancias del caso, al no oponerse o, cuando menos, explicar a la madre de la niña que la operación no era recomendable, y al no informar al cirujano que los criterios pediátricos contraindicaban la operación, el doctor Hidalgo, como pediatra de Alicia Marie, *se apartó del criterio de atención médica exigible en la práctica de la pediatría,* y por lo tanto, incurrió

---

[42] Según explicó, la implementación de este concepto exige al pediatra ser el "abogado del niño", no sólo en relación con otros médicos, sino también frente a los padres de éste, ello con la finalidad de protegerlo de una operación o procedimiento innecesario o contraindicado.

298

en negligencia. *Medina Santiago v. Vélez*, 120 D.P.R. 380 (1988); *Oliveros v. Abréu*, 101 D.P.R. 209 (1973).[43] Es cierto que aun cuando él hubiera cumplido con su deber de informar al cirujano y a los padres de la niña que la operación estaba contraindicada, éstos pudieron haber hecho caso omiso de su opinión y seguir adelante con la operación. Tal vez, no. No lo sabemos. *Lo que sí sabemos es que el doctor Hidalgo claramente incumplió con su deber y obligación de informarlo; permitiendo, de esa manera, que una operación que estaba contraindicada se llevara a cabo.*[44] Es norma reiterada que en Puerto Rico, debido al deber de previsión, una persona es responsable por las consecuencias probables de sus actos. *Pacheco v. A.F.F.*, 112 D.P.R. 296 (1982); *Rivera v. Pueblo*, 76 D.P.R. 404 (1954).

Ante tales circunstancias, somos del criterio que la *omi-*

---

[43] Cabe señalar también, que el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, sanciona tanto la negligencia por acción como por omisión.

[44] Según admitido por todos los peritos pediatras y por el propio doctor Hidalgo, los criterios pediátricos para la extirpación de amígdalas y adenoides son los siguientes, según establecidos en el texto de pediatría de Nelson:

" *'Indications for Tonsillectomy.* Parents often attribute frequent respiratory infections, allergic bronchitis, mouth-breathing, recurrent purulent or serous otitis, poor appetite, failure to gain weight, or recurrent or chronic fever to chronic tonsillitis. However, *there is no evidence that tonsillectomy and adenoidectomy decrease the incidence of these problems during childhood. Until better means are available to identify these children who may truly benefit from tonsillectomy and adenoidectomy, it seems prudent to avoid it in most cases.* Physician awareness that hospital charts were being monitored routinely by others to identify the stated indications for tonsillectomy and adenoidectomy have resulted in marked decrease in the frequency of these operations.

" *'Decision for removal of tonsils should be based on symptoms and signs directly related to the tonsils and to disturbances in closely related structures.* Local indications for removal are recurrent symptomatic hypertrophy associated with signs and symptoms of obstruction, and chronic infection. *Tonsillectomy should be considered only in those children who have 4 or more culture-proved episodes of group A streptococcal pharyngitis associated with tonsillitis in a year and in whom immunologic development is adequate, it should rarely be considered in a child under 2 years of age.*

" *'When, on rare occasions, it seems advisable to recommend tonsillectomy for a child of 2 to 3 years of age every attempt should be made to postpone the operation.* Frequently when the operation is postponed for reasons of age, the apparent need for it disappears whithin the next year or so.' " (Énfasis suplido.) Nelson, *op. cit.*, págs. 1178–1179, citado de Caso Núm. RE-89-43, Sentencia del Tribunal Superior, págs. 34–35.

*sión* del doctor Hidalgo, de su deber de intervenir en favor de los mejores intereses de su paciente, fue uno de los factores que, *con mayor probabilidad*, causó el daño y situó a Alicia Marie, *innecesariamente* en el quirófano. Véase *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639 (1988); *Ríos Ruiz v. Mark*, 119 D.P.R. 816 (1987).

■ Abona a la responsabilidad por impericia médica de la medicina el hecho de que el doctor Hidalgo, a pesar de haber sido llamado en varias ocasiones para que examinara a Alicia Marie luego del incidente acontecido durante la administración de la anestesia, no acudió a verla hasta el día siguiente. Somos del criterio *que su actitud de desinterés y dejadez* ante una situación de emergencia como la sucedida no está de acuerdo con la mejor práctica de la medicina. *Núñez v. Cintrón*, 115 D.P.R. 598, 615–616 (1984). En vista de lo anteriormente expuesto, *no* se cometieron los errores antes señalados.[45]

En su *octavo* señalamiento de error, el doctor Hidalgo imputa al foro de instancia haber errado al ignorar nuestro derecho procesal civil y al declarar sin lugar la desestimación solicitada por el recurrente. En primer lugar, alega que dado el alto número de demandantes y demandados involucrados en este pleito, el foro de instancia debió haber tomado medidas especiales para controlar el manejo ordenado de todas las etapas del caso. Citando a *Vellón v. Squibb Mfg., Inc.*, 117 D.P.R. 838 (1986), imputa al foro sentenciador haber errado al no llevar a cabo una conferencia con antelación al juicio bajo la Regla 37.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III. En segundo lugar, señala que no le fue notificada la vista de autorización

---

[45] Como tercer error, el doctor Hidalgo plantea que el foro de instancia no le debió imponer responsabilidad por haber abandonado a su paciente luego del incidente en la sala de operaciones. Alega que no hubo tal abandono y que tampoco existe relación causal alguna entre el supuesto abandono y los daños sufridos por la menor. En vista de lo antes resuelto, en relación con los errores primero, segundo y cuarto levantados por el doctor Hidalgo, se hace innecesario discutir este tercer error.

judicial en que los demandantes solicitaron permiso del tribunal para transigir con el codemandado doctor Menéndez.

■ En cuanto al primer punto, debemos señalar que el citado caso de *Vellón v. Squibb Mfg., Inc.*, ante, ciertamente indica que, *en casos complejos*, el juez debe, conforme a las necesidades y circunstancias particulares de cada caso, tomar las medidas apropiadas para asumir control de los procedimientos. En ningún momento, sin embargo, lo establecido en dicho caso obliga a la celebración de reuniones o conferencias en todos los casos. Además, el texto de la Regla 37.1 de Procedimiento Civil, ante, expresamente dispone que el tribunal *podrá* celebrar la conferencia con antelación al juicio *de estimarlo necesario*, pues su facultad para citar a tal conferencia es una discrecional.

■ En cuanto al segundo planteamiento, es de notar que las autorizaciones sobre derechos y bienes de menores se rigen por las disposiciones de los Arts. 614–616 del Código de Enjuiciamiento Civil, 32 L.P.R.A. secs. 2721–2723. En ese articulado se dispone que, a solicitud de los padres o tutor del menor, el tribunal celebrará vista sobre autorización. Dicha solicitud es una *ex parte* en la que figuran como interesados los padres, o tutores, que solicitan la autorización y el Ministerio Público representado por la Hon. Procuradora de Menores, a quien corresponde defender los intereses del menor. *Por lo tanto*, no era necesaria la notificación *ni* la presencia en la referida vista de autorización judicial de quienes no eran partes interesadas en cuanto a la petición de autorización. Véase 32 L.P.R.A. Ap. III, R. 67.1. Además, como parte de lo estipulado en la transacción, los restantes demandados retuvieron su derecho de nivelación frente a los que transaron con los demandantes, por lo que el error señalado no se cometió.[46]

---

[46] Por último, los recurrentes doctor Hidalgo y su aseguradora imputan que el foro de instancia permitió la radicación de un memorial *ex parte* sobre el cual nunca fueron notificados. Dicho error no se cometió. El referido memorial nunca fue radicado y no consta ni en el expediente ni en los autos originales del caso.

# IV

*Discusión de los errores planteados por la doctora Santaella*

El antiguo Tribunal Superior determinó que el Dr. Frederick González era responsable por las actuaciones negligentes de sus empleadas, entre las cuales se encuentra la doctora Santaella.([47]) Además entendió que los codemandados Dra. Gloria Santaella y Dr. Frederick González, así como el Hospital, incurrieron en actos negligentes al no ordenar el traslado inmediato de la niña a una institución médico hospitalaria que contara con el equipo y el personal necesarios para atender la condición en la cual se había colocado a la niña.

La Dra. Gloria Santaella, su aseguradora Universal Insurance Company, y la Administración del Fondo de Compensación al Paciente (en adelante la A.F.C.P.) recurrieron ante este Tribunal señalando varios errores que, en su opinión, justifican la revocación o modificación de la sentencia recurrida.([48])

---

([47]) Entiéndase, de las empleadas de Anesthesia Service III, entidad controlada en su totalidad por el doctor González. Véase discusión, pág. 317 y subsiguientes de esta opinión.

([48]) Según indican en su escrito ante este Tribunal, la sentencia recurrida debe ser revocada o modificada por los siguientes fundamentos:

"[PRIMERO]: La prueba de la propia parte demandante tendió a establecer que la condición en que se encuentra la menor Alice Marie se debió a una reacción idiosincrática [sic] al agente utilizado en el proceso de anestesia, condición que los recurrentes no podían prever y, por consiguiente[,] no se les puede imponer responsabilidad

"[SEGUNDO:] La Doctora Gloria Santaella, como anestesióloga, no es responsable legalmente de la condición en que se halla la menor Alice Marie por lo que la sentencia que le impone responsabilidad no debe prevalecer.

"[TERCERO:] Es errónea la sentencia en tanto en cuanto concede compensación por las alegadas pérdidas de la menor Alice Marie de generar ingresos futuros.

"CUARTO: Es errónea la sentencia en tanto en cuanto concede daños por alegados sufrimientos y angustias mentales de la menor Alice Marie.

En su *primer* señalamiento, nos indican que la prueba que desfiló ante el foro de instancia tendió a establecer que la causa del daño sufrido por Alicia Marie fue una reacción idiosincrásica al agente anestésico, la cual los recurrentes no podían haber previsto. En su *segundo* señalamiento, alega que el foro de instancia erró al responsabilizarle de la condición en que se encuentra la menor Alicia Marie. Por estar íntimamente relacionados, discutiremos ambos errores en conjunto.

La prueba que desfiló ante el foro de instancia fue consistente en el sentido de que, *luego de la primera reacción de la niña a la anestesia*, la doctora Santaella procedió, *de inmediato*, a anestesiarla nuevamente *sin haber determinado las razones por las cuales la niña reaccionó adversamente la primera vez que se le administró la anestesia*; induciendo, de esta forma, la ocurrencia del "insulto anóxico" que sufriera la niña. La doctora Santella pudo y debió prever el segundo episodio de complicación y, por lo tanto, es

---

"[QUINTO:] Ni el esposo de la Doctora Santaella ni la Sociedad de Gananciales fueron emplazados ni se sometieron a la jurisdicción del Tribunal por lo que es erróneo imponerle responsabilidad [a éstos].

"SEXTO: Los abuelos de la menor Alice Marie, a saber Doña Elba Toledo y Don Efraín Santos fallecieron antes de la celebración del juicio por lo que no pudieron testificar en cuanto a sus angustias mentales. Es erróneo, por ende, conceder compensación por sus posibles angustias a sus herederos.

"SEPTIMO: Las indemnizaciones concedidas a los demandantes son excesivas y no guardan proporción con los daños alegados.

"OCTAVO: Es improcedente, en derecho, imponer a la recurrente D[octora] Santaella y a su aseguradora el pago de intereses pre-sentencia [sic] y honorarios de abogado.

"NOVENO: La responsabilidad de la Administración del Fondo de Compensación al Paciente está limitada, por su póliza, a la suma de SETENTA Y CINCO MIL DÓLARES ($75,000), libre de intereses y del pago de honorarios de abogado.

"DECIMO: El Tribunal no puede responsabilizar a Respiratory Care of P.R., una asegurada de la compareciente Universal Insurance Company porque el servicio prestado por ésta lo fue a través de enfermeras graduadas competentes y porque no se estableció por la prueba, por los demandantes, a quien correspondía hacerlo, que Alicia Marie hubiese llegado al cuidado de esta entidad sin el daño que finalmente afecta su capacidad." Caso Núm. RE-89-40, Solicitud de revisión, págs. 5-10.

responsable de los daños causados por su falta de previsión. *Ella era la facultativa médica a cargo de la niña cuando ésta sufrió el incidente.* La propia doctora Santaella manifestó al tribunal de instancia que durante el proceso de anestesia la pequeña estaba bajo su control. T.E. de 15 y 16 de diciembre de 1987, pág. 101. Fue la doctora Santaella quien tomó la decisión de anestesiar nuevamente a la paciente.([49]) La doctora Santaella fue negligente, *además*, porque tenía conocimiento de que el equipo de anestesia y de emergencias pediátricas en el Hospital de la Guadalupe —quirófano B— era obsoleto y peligroso para la paciente y, aún así, se sirvió del mismo. *Así lo admitió.*([50]) Ante esta situación, concluimos que no se cometieron los dos (2) errores señalados.

En su *quinto* señalamiento de error, la doctora Santaella alega que ni su esposo, ni la sociedad de gananciales compuesta por ella y por éste fueron emplazados, por lo que no deben responder ante los demandantes. Debe señalarse que la sentencia del antiguo Tribunal Superior no impuso responsabilidad alguna al esposo de la doctora

([49]) Es por eso que el hecho de que la doctora Santaella fuera empleada del grupo de anestesia tampoco la exime de responsabilidad.

([50]) La doctora Santaella testificó que el equipo en el quirófano B era inadecuado ya que la máquina Compact-50 no tenía un analizador de oxígeno (T.E. de 15 y 16 de diciembre de 1987, págs. 34–35) y que, por lo tanto, no había garantía de que se le estaba administrando el por ciento de oxígeno deseado al paciente. Íd., pág. 37.

A su vez, la propia doctora Santaella afirmó que desde 1979 había reportado en repetidas ocasiones la necesidad de tener disponible en los quirófanos el equipo necesario y adecuado para atender situaciones de emergencia que pudieran surgir como consecuencia de la administración de una anestesia. Durante la vista evidenciaria ante el foro de instancia, la doctora Santaella señaló lo siguiente a preguntas del abogado de la parte demandante:

"P. Específicamente, en este caso el 16 de noviembre de 1981, usted estima que lo que ocurre se debe a la falta de esa máquina que usted dice que hubiera sido ideal tener allí.

"R. Licenciado, yo estoy absolutamente segura que si yo hubiera tenido un aparato de presión que me hubiera podido medir de forma exacta o por lo menos que me hubiera podido dar a mí una idea de qué era lo que le estaba pasando a la presión de esta niña desde la primera ocasión, yo hubiera podido hacer otra cosa y hubiera podido tomar otras indicaciones. Esta niña no cabe duda, de que su presión se tiene que haber ido al suelo la primera vez. ..." T.E. de 15 y 16 de diciembre de 1987, pág. 189.

Santaella; en consecuencia, no discutimos la parte del señalamiento que se refiere al esposo. En cuanto al señalamiento sobre la sociedad de gananciales, la parte demandante recurrida alega que, aunque la mejor práctica en nuestra jurisdicción es que cada uno de los cónyuges sea emplazado por separado, se puede emplazar a uno de ellos como representante de la sociedad de gananciales. Se apoya en *Pauneto v. Núñez*, 115 D.P.R. 591 (1984); *Int'l Charter Mortgage Corp. v. Registrador*, 110 D.P.R. 862 (1981); *García v. Montero Saldaña*, 107 D.P.R. 319 (1978), y *Cruz Viera v. Registrador*, 118 D.P.R. 911 (1987), para sostener que el emplazamiento de uno solo de los codemandados, *como coadministrador de la sociedad de gananciales*, es suficiente para que el tribunal adquiera jurisdicción sobre la misma. Tiene razón.

En *Pauneto v. Núñez*, ante, pág. 594, resolvimos a estos efectos que:

> ... [c]on relación a la sociedad conyugal, hemos reconocido que con el emplazamiento de uno solo de los coadministradores de dicha sociedad es posible adquirir jurisdicción sobre la misma. *Int'l Charter Mortgage Corp. v. Registrador*, [ante, pág. 864]; *García v. Montero Saldaña*, [ante, pág. 341]. Sin embargo, la mejor práctica es incluir a ambos como medida cautelar ante la eventualidad de que exista un conflicto de intereses. *Alicea Álvarez v. Valle Bello, Inc.*, 111 D.P.R. 847, 854 (1982).

■ En Puerto Rico, a partir de la reforma de los artículos del Código Civil sobre la sociedad legal de gananciales, ambos esposos son coadministradores de la sociedad de gananciales y, por lo tanto, ambos están, de ordinario, capacitados para representarla. *Pauneto v. Núñez*, ante. A la luz de lo antes consignado, resultaba innecesario emplazar al esposo de la codemandada doctora Santaella.

## V

*Discusión de los errores señalados por el doctor Frederick González*

El antiguo Tribunal Superior impuso responsabilidad tanto al doctor González como al Hospital por no tener el personal debidamente adiestrado y por intervenir con la paciente con equipo inapropiado.[51] Además, impuso responsabilidad al doctor González por las actuaciones negligentes de sus empleadas, a saber, la doctora Santaella y las enfermeras anestesistas Sra. María Leguillow y Sra. Gloria Ayala de Ferrer. El doctor González recurre de dicha sentencia señalando varios errores por parte del tribunal de instancia.[52]

---

[51] Véase Sentencia del antiguo Tribunal Superior de 28 de noviembre de 1988.

[52] En total, señala que el tribunal de instancia cometió catorce errores, a saber:

"PRIMER ERROR: ... al imputar responsabilidad por actos de impericia médica a las co-demandadas Gloria Ayala y María Leguillow quienes tan sólo estuvieron presentes en el quirófano del Hospital Nuestra Señora de la Guadalupe como enfermeras-anestesistas estando en todo momento bajo el control, dirección y supervisión de la anestesióloga a cargo del caso Dra. Gloria Santaella sin que sus actuaciones en forma alguna guarden relación causal con el incidente que sufriera la menor Alicia Marie Santos Blás.

"SEGUNDO ERROR: ... al estimar responsabilidad de la co-demandada-recurrida Respiratory Care of Puerto Rico Inc., quien no intervino como entidad corporativa en incidente alguno relacionado con el desenlace de la administración del procedimiento de anestesia en la menor Alicia Marie Santos Blás limitándose la presentación de sus servicios al cuidado respiratorio post-intervención quirúrgica e inmunizándole de relación causal con el desenlace crítico de dicha intervención.

"TERCER ERROR: ... al determinar que la codemandada-recurrida Doctora Gloria Santaella era empleada del codemandado-recurrente Dr. Frederick J. González al momento de su intervención como anestesióloga a cargo del caso en la intervención quirúrgica de la menor Alicia Marie Santos Blás.

"CUARTO ERROR: ... al estimar la responsabilidad del Dr. Frederick J. González utilizando arbitrariamente elementos tales como que el equipo utilizado en las facilidades del Hospital Nuestra Señora de la Guadalupe al momento de la intervención el 16 de noviembre de 1981 era uno inadecuado; que era propiedad conjunta del Dr. Frederick J. González y del Hospital Nuestra Señora de la Guadalupe; que su alegada falta de mantenimiento y obsolencia guardaba relación causal con la ocurrencia del incidente a la menor Alicia Marie Santos Blás; y que hubo irregularidades en la preparación de los récords médicos.

"QUINTO ERROR: ... al conceder una compensación por daños a los demandantes-recurridos Efraín Santos Rivera y Elba Toledo quien [sic] a la fecha de la celebración del juicio habían fallecido y no presentaron prueba directa de sus alegados daños.

En su *primer* señalamiento de error, el doctor González cuestiona la corrección de la determinación del antiguo Tri-

"SEXTO ERROR: ... al conceder una compensación en la suma de $500,000.00 a la menor Alicia Marie Santos Blás por concepto de los daños físicos y mentales que le han sido ocasionados y los cuales aún continúa y continuará sufriendo, a pesar de que la prueba pericial incontrovertida estableció que al momento del incidente sufrió un grave daño cerebral irreversible que le colocaba en un estado similar a un recién nacido pero en grado menor por no tener la capacidad de "fijación central de un bebé".

"SÉPTIMO ERROR: ... al conceder una compensación en la suma de $391,043.27 a la menor Alicia Marie Santos Blás por concepto del costo de cuido diario necesario durante su expectativa de vida estimada, a pesar de que la prueba pericial estableció una expectativa de 15 años que descontada al 12% reportaba un costo de $186,732.00 y/o al 6% de $238,379.97.

"OCTAVO ERROR: ... al conceder como compensación a la menor Alicia Marie Santos Blás la suma de $30,000.00 por el menoscabo sufrido en su potencial de generar ingresos a pesar de que la prueba pericial incontrovertida estableció que la condición de la menor es una de "muerte cerebral" que la equipara a lo resuelto por este Honorable Tribunal Supremo en el caso de *Pate* v. *USA*, 88 JTS 22, opinión de marzo 4 de 1988.

"NOVENO ERROR: ... al conceder una compensación a la codemandante Ivelisse Blás Toledo en la suma de $800,000.00 por los sufrimientos y angustias mentales sufridos y que continuará sufriendo debido a la condición física y mental en que está su hijita constituyendo la misma una cuantía altamente irrazonable y participando de la naturaleza de daños punitivos.

"DÉCIMO ERROR: ... al conceder una compensación al codemandante Luis Santos Colón, padre biológico de la menor Alicia Marie Santos Blás en la suma de $300,000.00 por los sufrimientos y angustias mentales sufridos y que continuará sufriendo constituyendo dicha suma una altamente irrazonable y participando de la naturaleza de daños punitivos.

"DECIMOPRIMER ERROR: ... al conceder a Luis Edgardo Nieves Piñeiro, padrastro de la menor Alicia Marie Santos Blás la suma de $50,000.00 por todos sus sufrimientos y angustias mentales constituyendo la misma una suma altamente irrazonable y participando de la naturaleza de daños punitivos.

"DECIMOSEGUNDO ERROR: ... al conceder una compensación en la suma de $15,750.00 a la codemandante Ivelisse Blás Toledo por la pérdida de ingresos sufrida; a la Sociedad Legal de Gananciales compuesta por Luis Edgardo Nieves Piñeiro e Ivelisse Blás Toledo de $29,250.00 por la merma sufrida en sus ingresos; a la Sociedad Legal de Gananciales compuesta por Luis E. Nieves Piñeiro e Ivelisse Blás Toledo en la suma de $8,700.00 por concepto de gastos especiales incurridos en el cuido, diagnóstico y tratamiento de Alicia Marie; por constituir todas dichas partidas, daños especiales que no fueron reclamados ni alegados en la demanda radicada.

"DECIMOTERCER ERROR: ... al conceder la suma de $25,000.00 a Carmen Iris Piñeiro madre de Luis E. Nieves quien era padrastro de Alicia Marie por constituir una cantidad altamente irrazonable y participar de la naturaleza de daños punitivos.

"DECIMOCUARTO ERROR: ... al estimar que las comparecientes recurrentes incurrieron en temeridad condenándoles a satisfacer el pago de la suma de $60,000.00 en honorarios de abogados e intereses al 12%." (Énfasis suprimido.) Caso Núm. RE-89-48, págs. 5–8. Véanse las págs. 5–9 del Alegato de los codemandados recurrentes Dr. Frederick A. González; Gloria Tancin de González; la Sociedad Legal de Gananciales compuesta por éstos; Anesthesia Service III; Respiratory Care of Puerto Rico, Inc.; Gloria Ayala, y María Leguillow.

bunal Superior de imponer responsabilidad por "impericia médica" a las enfermeras anestesistas empleadas de Anesthesia Service III y el doctor González.

■ En relación con la responsabilidad de las enfermeras por actos u omisiones, hemos resuelto que una enfermera debe ejercitar un grado de cuidado razonable para evitar causar daño innecesario al paciente, y dicho grado de cuidado debe responder al grado de cuidado ejercitado por otras enfermeras en la localidad o localidades similares. *Castro v. Municipio de Guánica*, 87 D.P.R. 725, 728–729 (1963). "En los hospitales del país las enfermeras y el resto del personal paramédico tienen el ineludible deber de realizar y llevar a cabo, con la premura requerida y a tono con las circunstancias particulares de cada paciente, *las órdenes médicas*". (Énfasis suplido.) *Núñez v. Cintrón*, ante, págs. 608–609.

■ A su vez, en *Reyes v. Phoenix Assurance Co.*, 100 D.P.R. 871, 881–882 (1972), hicimos las siguientes advertencias respecto a las enfermeras:

> ... las enfermeras que rinden servicios en los dispensarios u hospitales ... no deben atribuirse las facultades de los médicos. Estamos obligados a censurar la práctica de que aquéllas asuman las facultades a espaldas de éstos. Su obligación hacia el paciente y con el médico es llamar la atención a éste de los síntomas o quejas de aquéllos. Los pacientes se merecen el cuido esmerado y responsable de las enfermeras de dichas instituciones. En muchas ocasiones la enfermera es el único medio de comunicación entre el médico y el paciente. No puede permitirse que el paciente quede exclusivamente a merced de los caprichos o deseos de las enfermeras.

■ Remitiéndonos al caso en cuestión, las enfermeras anestesistas señora Ayala y señora Leguillow —empleadas del doctor González— fueron asignadas al quirófano B donde se le administró la anestesia a la pequeña Alicia. En ese momento, éstas estaban allí presentes bajo el mando y la supervisión de la doctora Santaella, aneste-

sióloga a cargo. Según surge de la prueba presentada, las enfermeras aludidas se limitaron a seguir las órdenes que le impartía la doctora Santaella (T.E. de 9 de diciembre de 1987, pág. 315) y *en forma alguna participaron, de propia iniciativa, en el proceso*; limitándose su intervención a estar presentes en el quirófano y a asistir a la doctora Santaella siguiendo sus órdenes. Las enfermeras allí presentes en ningún momento tomaron decisión alguna con relación al procedimiento a seguir. *Tampoco desfiló prueba de que las referidas enfermeras de alguna forma incumplieran con sus deberes no llevando a cabo una orden médica.* Véase *Berríos v. U.P.R.*, 116 D.P.R. 88, 101 (1985).[53] Ante esta situación, somos del criterio que *no* se probó por la parte demandante[54] el nexo causal necesario bajo el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, entre las actuaciones de las enfermeras y la ocurrencia del paro cardíaco de la niña y, consecuentemente, el daño cerebral irreversible. Por lo tanto, no procede imponer responsabilidad a las señoras Ayala y Leguillow por sus actuaciones. Erró el tribunal de instancia al así hacerlo.

▐ En el *tercer* señalamiento de error, el doctor González cuestiona la corrección de la determinación del foro de instancia de que la codemandada recurrida Dra. Gloria Santaella era su empleada al momento del accidente. No le asiste la razón. La determinación del tribunal a quo,[55] de que la doctora Santaella efectivamente era empleada del Dr. Frederick González, es una correcta y sostenida por la

---

[53] En el referido caso de *Berríos v. U.P.R.*, 116 D.P.R. 88 (1985), resolvimos que las enfermeras no pueden adjudicarse facultades que no les confiere la ley, su cargo, ni su deber.

[54] " 'Sabido es que, como regla general, le corresponde a la parte actora en un caso de daños y perjuicios donde alegue haber sufrido daños como consecuencia de la negligencia de la parte demandada el peso de la prueba respecto a dicha alegada negligencia." ' *Matos v. Adm. Servs. Médicos de P.R.*, 118 D.P.R. 567, 569 (1987); *Vaquería Garrochales, Inc. v. A.P.P.R.*, 106 D.P.R. 799 (1978); *Irizarry v. A.F.F.*, 93 D.P.R. 416 (1966); *Morales Mejías v. Met. Pack. & Ware Co.*, 86 D.P.R. 3 (1962).

[55] Véase la Determinación de Hecho Núm. 66 de la sentencia de instancia.

prueba. *No* intervendremos a nivel apelativo con esta determinación de hecho efectuada por el juzgador de los hechos ya que, como veremos, éste no incurrió en error manifiesto, pasión, prejuicio o parcialidad respecto a ello. *Sánchez Rodríguez v. López Jiménez,* 116 D.P.R. 172, 181 (1985); *Pérez Cruz v. Hosp. La Concepción,* 115 D.P.R. 721 (1984). Veamos.

De entrada, cabe establecer que para el año 1981 y aún desde antes de esa fecha, entre el Hospital y el Dr. Frederick González existía un contrato de exclusividad, mediante el cual este último era el responsable de proveer todos los médicos anestesiólogos y las enfermeras anestesistas para los servicios de anestesia del Hospital de la Guadalupe.[56] *El propio* Dr. Frederick González testificó sobre la existencia del contrato de exclusividad con el Hospital.[57] Explicó que, salvo en casos excepcionales, solamente a él y a los médicos anestesiólogos contratados por él se les permitía dar anestesia en ese Hospital. A su vez, el doctor González admitió que era miembro de la Junta del referido Hospital. T.E. de 15 y 16 de diciembre de 1987, pág. 352.

Ese hecho, de por sí, es suficiente para sostener la corrección de la determinación del tribunal de instancia respecto a la relación de patrono-empleado del doctor González con la doctora Santaella. Resulta obvio que para poder un médico prestar sus servicios como anestesiólogo en el

---

[56] El doctor González tenía que asegurar al Hospital que cada uno de los anestesiólogos estaba acreditado, para lo cual tenía que someter por escrito los credenciales de éstos a la Administración, para que el Comité de Credenciales del Hospital estudiara y aprobara su solicitud. Por su parte, un procedimiento similar se utilizaba con las enfermeras anestesistas.

Véase la Determinación de Hecho Núm. 64 de la sentencia de instancia.

[57] La parte demandante también ofreció en evidencia una deposición tomada el 6 de abril de 1984 al Sr. Josué Colón Rodríguez, quien en ese entonces era el Administrador del Hospital de la Guadalupe. El señor Colón Rodríguez falleció con antelación a la vista del caso, por lo que, al amparo de lo dispuesto en la Regla 64(b)(1) de Evidencia, 32 L.P.R.A. Ap. IV, la misma fue admitida por el foro de instancia. En esa deposición, el señor Colón Rodríguez había declarado sobre la existencia del contrato de exclusividad entre el Hospital y el doctor González.

Hospital, éste tenía que ser contratado por el propio doctor González conforme al referido contrato de exclusividad. Por otro lado, surge de la prueba presentada que la doctora Santaella efectivamente había sido contratada personalmente por el doctor González y que su compensación era a base de una cantidad mensual estipulada. Así lo declaró la propia doctora Santaella.([58]) Dicho contrato, según testificó la doctora Santaella, fue uno verbal que nunca se plasmó por escrito. T.E. de 15 y 16 de diciembre de 1987, pág. 9.([59])

Cabe señalar que el control y dominio del doctor González llegaba a tal extremo que le hacía creer a sus pacientes que él personalmente le administraría la anestesia, sabiendo que luego él escogería el médico que él quisiera para atender a un paciente en específico para proveerle la anestesia. En vista de esto, podemos concluir que los pacientes atendidos por la doctora Santaella no eran sus propios pacientes sino los de Anesthesia Service III, entidad controlada por el doctor González.([60]) A su vez, la doctora Santaella no tenía discreción en cuanto a los honorarios a cobrar a los pacientes. Además, el equipo de anestesia que ésta utilizaba no era suyo sino de Anesthesia Service III o del doctor González. Por su parte, a la doctora Santaella no se le compensaban sus servicios cada vez que los realizaba,

---

([58]) Véase la T.E. de 15 y 16 de diciembre de 1987, pág. 11.

Según el testimonio del doctor González, los miembros del grupo de anestesia no recibían sueldos, sino una cantidad de participación. TE de 15 y 16 de diciembre de 1987, pág. 313. Por las razones que expondremos no nos merece credibilidad esta afirmación.

([59]) Sin embargo, el acuerdo entre la Dra. Antonia Jorge y el Dr. Frederick González se efectuó por el doctor González en manuscrito y contiene varias cláusulas relativas a días, horas, lugar de trabajo, vacaciones, guardias, entre otras. No obstante no existir ninguna alusión expresa al salario de la doctora, la cláusula quinta del mismo dispone que "[d]espués de un año habrá aumento para negociar dependiendo de la calidad y productividad de su trabajo". Este contrato se presentó como *exhibit* de la parte demandante en el juicio. Véase la Determinación de Hecho Núm. 66 de la sentencia de instancia.

([60]) Decimos que Anesthesia Service III estaba controlada por el doctor González ya que de su propio testimonio surge, por ejemplo, que Anesthesia Service III no rendía una planilla sobre ingresos, sino que el doctor González en su propia planilla personal sobre ingresos también reportaba las ganancias y los ingresos de Anesthesia Service III. T.E. de 15 y 16 de diciembre de 1987, págs. 345–346.

sino que el doctor González le pagaba un sueldo fijo mensual por un horario de trabajo preestablecido.

Por último, con relación a los cheques presentados en evidencia ante el tribunal de instancia por el doctor González —intentando demostrar que la doctora Santaella no era su empleada— los mismos en nada demuestran que ésta no lo fuera. Por el contrario, a nuestro entender, las cantidades consignadas en los cheques y otorgadas en concepto de "honorarios" evidencian salarios percibidos por la doctora Santaella.

En el *séptimo* señalamiento de error, se cuestiona la cuantía concedida por el foro de instancia a la menor Alicia Marie Santos Blás por concepto del costo de cuido diario necesario durante su expectativa de vida estimada. El error señalado no fue cometido *en su origen*. El tribunal recurrido concedió la suma de trescientos noventa y un mil cuarenta y tres dólares con veintisiete centavos ($391,043.27) a la menor Alicia Marie por concepto del costo del cuido diario necesario dentro de su expectativa de vida estimada. Somos del criterio que dicha cantidad de dinero era, *originalmente*, correcta ya que el tribunal acogió la misma de acuerdo al testimonio pericial —no controvertido— presentado por los demandantes. Veamos.

El tribunal sentenciador tuvo ante sí el testimonio de los peritos médicos —doctor Mirabal Font y Dr. José Álvarez Álvarez— y el perito actuarial Sr. Antonio Queipo Rodríguez. El doctor Mirabal Font estimó que la expectativa de vida de Alicia Marie a partir del incidente anóxico era de veinticinco (25) años, la cual al momento del juicio era de diecinueve (19) años, ya que el juicio se celebró seis (6) años después del incidente. La juez dio credibilidad al testimonio del doctor Mirabal Font y concluyó que la expectativa de vida de la menor era de diecinueve (19) años a partir del juicio. Según se explicó, la expectativa de vida de la niña era tan alta debido al excelente cuido que le brindaba su madre y sus familiares, quienes se desvivieron por

cooperar y mantener a la niña saludable dentro de su estado irreversible.

Por su parte, al perito actuarial señor Queipo se le solicitó que, a base de la expectativa de vida de la niña según ésta fue estimada por el doctor Mirabal Font y las cifras ofrecidas por el doctor Álvarez, calculase la suma de dinero que se necesitaría hoy para el cuido y atención de la niña por la expectativa de vida estimada. En vista de la prueba pericial desfilada, al señor Queipo se le plantearon tres (3) alternativas: (1) recluir permanentemente a Alicia Marie en un hospital privado especializado en el cuido y atención de pacientes con daño cerebral severo; (2) dejar a la niña en su hogar y contratar *tres* (3) turnos de enfermeras de lunes a viernes y un turno los sábados y los domingos, la madre entonces la atendería los fines de semana, o (3) dejar a la niña en su hogar y contratar *dos* (2) turnos diarios de enfermeras de lunes a viernes, un turno los sábados y los domingos, la madre entonces realizaría el tercer turno durante la semana y los fines de semana.

El señor Queipo estimó la primera alternativa en setecientos ochenta y nueve mil novecientos ochenta y seis dólares con cuarenta centavos ($789,986.40), cifra que representa la suma de dinero que la niña necesitaría para que genere sesenta mil dólares ($60,000) por los próximos diecinueve (19) años.[61] Esta alternativa fue descartada por la propia madre de la niña ya que significaría que su hija estaría separada de ella, cosa que ella considera inaceptable.

El costo de la segunda alternativa se calculó en quinientos ochenta y cuatro mil doscientos noventa y cinco dólares con ochenta y dos centavos ($584,295.82), cifra que repre-

---

[61] El perito Dr. José Álvarez estimó que la cuantía de costo de cuido diario para la atención básica del paciente en una institución es de ciento cincuenta dólares ($150), lo que representa un total de cincuenta y cinco mil dólares ($55,000) anuales más cinco mil dólares ($5,000) para otros gastos incidentales a la condición para un total de sesenta mil dólares ($60,000) anuales con un aumento de un dos (2) a un tres (3) por ciento por año.

senta la suma de dinero necesaria hoy para que genere cuarenta y cuatro mil trescientos setenta y seis dólares con setenta centavos ($44,376.70) anuales por los próximos diecinueve (19) años.([62]) La tercera alternativa se calculó en trescientos noventa y un mil cuarenta y tres dólares con veintisiete centavos ($391,043.27), cifra que representa la suma de dinero necesaria hoy para que genere veintinueve mil setecientos tres dólares con setenta centavos ($29,703.70) anuales por los próximos diecinueve (19) años.([63])

El tribunal de instancia acogió la tercera alternativa; de hecho la que resultó menos costosa. Se escogió ésta por ser la más conveniente ya que permitía a Ivelisse renunciar a su trabajo para asumir uno de los dos (2) turnos semanales de enfermeras, y éste ser remunerado de manera que esa remuneración sustituya su salario. De esta forma, ella pasaría más tiempo con su hija y tendría los ingresos necesarios para mantenerse ella y su hija.

Ahora bien, y como señaláramos en el escolio 37, la niña Alicia Marie falleció el día 18 de mayo de 1992. *La suma de dinero concedida por este concepto debe ser modificada, al recibo del mandato, por el tribunal de instancia para tomar en consideración ese hecho*, determinante de la necesidad de cuido de la infortunada joven.

Mediante el *decimosegundo* señalamiento de error, se cuestiona la procedencia de varias partidas concedidas a la codemandante Ivelisse Blás Toledo por la pérdida de ingreso sufrida, a la Sociedad de Gananciales —compuesta

---

([62]) Cada turno de enfermeras representa un costo de cuarenta dólares ($40) diarios a un costo anual de treinta y nueve mil seiscientos veintiocho dólares con cinco centavos ($39,628.05), más una suma adicional de cuatro mil seiscientos setenta y cinco dólares con sesenta y cinco centavos ($4,675.65) por el costo del equipo necesario para su cuido, para un total de cuarenta y cuatro mil trescientos setenta y seis dólares con setenta centavos ($44,376.70) anuales.

([63]) El costo anual de los turnos de enfermeras es de veinticinco mil veintiocho dólares con cinco centavos ($25,028.05), más la suma fija de cuatro mil seiscientos setenta y cinco dólares con sesenta y cinco centavos ($4,675.65) por el costo del equipo, para un total de veintinueve mil setecientos tres dólares con setenta centavos ($29,703.70).

por ésta y por Luis Edgardo Nieves Piñeiro— por concepto de merma de ingresos y gastos especiales. Alega que dichas partidas constituyen daños especiales que no fueron reclamados ni alegados en la demanda. No le asiste la razón.

En relación con la madre de Alicia Marie, en la demanda enmendada se alegó que "la codemandante Ivelisse Blás Toledo de Nieves, madre de la menor afectada, Alicia Marie Santos Blás, ha sufrido, continúa sufriendo en el presente y sufrirá en el futuro, graves y profundas angustias mentales y morales *y además se ha visto obligada a abandonar su trabajo como secretaria, por cuyos servicios devengaba un salario, al momento de los hechos, de $750.00 mensuales*". (Énfasis suplido.) Caso Núm. RE-89-48, Demanda enmendada, pág. 12. Además, se alegó que "[d]ebido a la condición en que vive su menor hija afectada, la codemandante Ivelisse Blás Toledo de Nieves, *se ha convertido en una enfermera práctica durante las veinticuatro horas del día*, con la ayuda de su suegra, Carmen Iris Piñeiro y de su señora madre, Elba Toledo, abuela de la niña, todo cuyos daños estiman en una suma no menor de CUATROCIENTOS MIL DOLARES ($400,000.00), *incluyéndose el lucro cesante* y los sufrimientos". (Énfasis suplido.)[64] Íd. En cuanto a la Sociedad de Gananciales en cuestión, se alegó en la referida demanda que ésta *"ha sufrido pérdidas consistentes en las sumas que aportaba la codemandante Ivelisse Blás Toledo de Nieves* a dicha sociedad de gananciales y además, *ha incurrido y se mantendrá incurriendo en gastos cont[i]nuos*, cuya suma se estima en una cantidad no menor de DOSCIENTOS MIL DOLARES ($200,00.00)". (Énfasis suplido.)[65] Íd., pág. 13.

En lo pertinente, la Regla 7.4 de Procedimiento Civil, 32 L.P.R.A. Ap. III, exige que "cuando se reclamen daños especiales, se detallarán el concepto de las distintas

---

[64] Véase las alegaciones Núms. 55 y 56 sobre daños en la Demanda Enmendada del caso de autos.

[65] Véase la alegación Núm. 57 sobre daños en la Demanda Enmendada.

partidas". Véanse: *Prado v. Quiñones*, 78 D.P.R. 322 (1955); *Betances v. Autoridad de Transporte*, 73 D.P.R. 223 (1952); *Tuya v. White Star Bus Line, Inc.*, 59 D.P.R. 790 (1942). En *Betances v. Autoridad de Transporte*, ante, pág. 225, este Tribunal entendió que una alegación a los efectos de que: " *'se ha visto obligada a recluirse en cama"*, a recibir asistencia médica; *ha tenido que paralizar por completo sus labores*, ha sufrido intensos dolores físicos y angustias mentales; *y quedará incapacitada para toda clase de trabajo*" (énfasis en el original), era una alegación suficiente para que se le compensaran los daños especiales. En esa ocasión nos expresamos como sigue:

> Consideramos que las alegaciones contenidas en el párrafo cuarto de la demanda, supra, informaron a las demandadas que el demandante no estaba haciendo una reclamación de daños generales por las lesiones sufridas por su esposa sino que en ellas también incluía una reclamación de daños por el tiempo que ella perdió en sus labores por haber estado incapacitada para toda clase de trabajo. Es cierto que dichas alegaciones no son un modelo de perfección y pudieran ser más específicas, empero no es menos cierto que las demandadas tenían a su alcance los medios que las Reglas de Enjuiciamiento Civil les concedían para solicitar información específica y detallada de los daños alegados, Regla 12(e); para someter interrogatorios, Regla 33; para obtener un examen físico de la esposa del demandante, Regla 35; y que ninguno de esos remedios utilizaron.
>
> Si bien la Regla 9(g) requiere que cuando se reclamen daños especiales sus distintas partidas se alegarán específicamente, .ello no implica que una alegación como la contenida en el párrafo cuarto, *supra*, no pueda considerarse suficiente cuando, como en el presente caso, las demandadas no utilizaron los medios que las propias reglas les concedían para obtener cualquier información adicional que desearan. (Citas y escolios omitidos.)

Siguiendo esta misma línea de pensamiento, somos del criterio que los daños especiales, concedidos en el presente caso, *sí fueron alegados y reclamados*, razón por la cual entendemos que las alegaciones en relación con la señora Blás Toledo y la referida Sociedad de Gananciales cumplen con el requisito dispuesto en la Regla 7.4 de Procedimiento

Civil, ante. De la alegación específica en controversia surge que la demandante informó a los demandados que no estaba haciendo una reclamación de daños generales por las lesiones sufridas por su hija, sino que en ellas también incluía una reclamación de daños por haberse visto forzada a dejar su empleo. Llegamos a esta conclusión ya que se hace mención específica de la situación en la cual la señora Blás Toledo se encontró luego de lo acontecido con su hija. Esto es, que se vio forzada a abandonar su trabajo y dedicarse a ser una enfermera las veinticuatro (24) horas del día para atender a su hija. Por otro lado, también se mencionan específicamente en la demanda las pérdidas que ha sufrido la sociedad de gananciales debido a que ésta ya no puede contar con las aportaciones monetarias de la señora Blás Toledo.

En vista de lo antes dispuesto, somos del criterio que el tribunal de instancia actuó correctamente al concederle las sumas en cuestión por concepto de daños especiales, ya que las mismas fueron alegadas, detalladas y probadas por los demandantes.

Ahora bien, como señaláramos anteriormente, y en vista del fallecimiento de la niña Alicia Marie, *la suma de dinero concedida por este concepto debe también ser modificada por el tribunal de instancia al recibo del mandato para tomar en consideración ese hecho.*

## VI

*Discusión de los errores señalados por el Hospital de la Guadalupe*

El antiguo Tribunal Superior impuso responsabilidad al Hospital de la Guadalupe por: (1) los actos negligentes de la Dra. Gloria Santaella y del Dr. Frederick González, ello así por razón de su relación contractual de exclusividad; (2) *por mantener quirófanos con maquinaria obsoleta y equipo inadecuado, de lo cual tenían pleno conocimiento*; (3) por

ofrecer servicios médicos con personal no autorizado; (4) por mantener los récord médicos de Alicia Marie de una forma ineficiente con graves inexactitudes que reflejan que fueron manipulados y alterados;[66] (5) por no ordenar el traslado de la niña a una institución donde existiese el equipo y el personal necesarios para atender la condición en que quedó la niña luego del incidente, y (6) por haberla dejado en una sala de cuidado intensivo en la cual no había el equipo necesario, con el propósito de ocultar el incidente ocurrido en el quirófano y la grave condición en que quedó

---

[66] El foro de instancia determinó la existencia de las siguientes inexactitudes en el récord médico de Alicia Marie: (1) en el récord médico se describe que el estado de la niña al ser dada de alta del Hospital la Guadalupe para ser transferida al Hospital Pediátrico era de mejoría (*improved*), cuando lo cierto es que la niña salió del Hospital en estado comatoso; (2) se indica que a la niña se le hicieron estudios electrocardiográficos (E.K.G), cuando lo cierto es que nunca se le hizo un E.K.G completo, razón por la cual no aparecen en el récord los resultados de dicho estudio (sólo aparecen unos trazados de una sola derivación hecha en la sala de cuidado intensivo); (3) en las páginas del récord que se refieren a la admisión de la niña al Hospital de la Guadalupe, se indica que ésta estaba en la unidad de cuidado intensivo a cargo de la doctora Zayas, cuando la realidad es que al ser admitida al Hospital, la niña fue asignada a una habitación en el cuarto piso y no fue ingresada en la unidad de cuidado intensivo hasta después de haber ocurrido el incidente en el quirófano B; además, esas hojas del récord aparecen firmadas por el cirujano doctor Menéndez, quien no vio a la niña el día de su ingreso al Hospital, sino que la vio por primera vez el día siguiente, estando ya en el área del quirófano; (4) las hojas del récord médico relacionadas con el cuidado en la sala de recuperación (*recovery room*) son esquemáticas e ineficientes, pues no reflejan que se hayan cumplido las órdenes médicas supuestamente impartidas por la doctora Santaella y la doctora Zayas; (5) la primera entrada en las notas de progreso (*progress notes*) lo es una anotación de admisión escrita y firmada por el Dr. Ferdinand Menéndez, de 15 de noviembre de 1981, cuando la prueba estableció que el doctor Menéndez no vio a la niña hasta el 16 de noviembre, cuando ésta fue llevada al quirófano; (6) la tercera nota en esa misma página del récord médico fue aparentemente escrita de puño y letra del propio doctor Menéndez, sin embargo, la letra en que está hecha esa anotación difiere sustancialmente de la que aparece en la primera anotación y que supuestamente fue hecha también por el doctor Menéndez; (7) se indica que con la recomendación y aprobación del Dr. Frederick González, la niña estuvo en la unidad de cuidado intensivo asignada a un tal doctor Negrón y a una enfermera anestesista, cuando la realidad es que el supuesto doctor Negrón no era doctor en medicina, sino estudiante de la escuela de terapia respiratoria que el Dr. Frederick González opera en el Hospital y que la llamada enfermera anestesista era una estudiante bajo entrenamiento en la escuela de anestesistas del Dr. Frederick González; (8) que la copia certificada del récord obtenida del Hospital por la parte demandante, al comenzar el pleito, tenía sin completar los espacios de la hoja de consentimiento para operación donde se describe la naturaleza del procedimiento a practicarse, mientras que en el original de esa misma hoja, ofrecido en evidencia durante la vista del caso, aparece con ese espacio completado con un tipo de maquinilla distinto al del resto del texto.

la·niña.([67]) El Hospital ha recurrido de dicha sentencia planteando varios señalamientos de error.([68])

En su *primer* señalamiento de error, el Hospital alega que el foro de instancia incidió al declarar no ha lugar la moción de la parte demandada recurrente solicitando determinaciones de hecho adicionales a tenor con las disposiciones de la Regla 43.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III. En ésta se dispone, en lo pertinente, que:

---

([67]) Véase la Sentencia del foro de instancia, págs. 110–112.

([68]) El Hospital señala los siguientes errores cometidos por el tribunal de instancia:

"1. ... al declarar no ha lugar a la moción de la parte demandada-recurrente solicitando determinaciones de hecho adicionales a tenor con las disposiciones de la Regla 43.3 de las de Procedimiento Civil.

"2. ... al hacer una determinación de que la responsabilidad imputada al Hospital codemandado está cubierta bajo la póliza de responsabilidad profesional hospitalaria al igual que bajo la cubierta de la responsabilidad general civil.

"3. ... al determinar que el Dr. Roberto Bengoa actuó en forma negligente y descuidada apartándose de las normas generalmente aceptadas por la profesión médica.

4. ... al determinar que el Hospital Nuestra Señora de la Guadalupe procedió en forma negligente y descuidada, tanto en la atención y cuidado médico hospitalario que debió haberle dado a su paciente como en su obligación de mantener en forma adecuada sus facilidades físicas y tener disponible el equipo e instrumentos necesarios para atender a un niño o paciente en crisis y al no tener debidamente adiestrado a todo su personal, especialmente el asignado a sus quirófanos, salas de recuperación y unidad de cuidado intensivo.

"5. ... al condenar a los demandados al pago de $500,000.00 a la menor Alicia Marie Santos Blás por concepto de los daños físicos y mentales que le han sido ocasionados y los cuales aun continúa sufriendo.

"6. ... al ordenar a los demandados el pago de $800,000.00 por sufrimientos y angustias a la codemandante Ivelisse Blás Toledo, al pago de $300,000.00 por los sufrimientos y angustias mentales del codemandante Luis Santos Colón y al pago de $50,000.00 por los sufrimientos y angustias mentales del codemandante y padrastro de la menor Alicia Marie, Luis Nieves Piñeiro.

"7. ... al condenar a los demandantes al pago de $25,000.00 a la sucesión de Efraín Santos Rivera, abuelo paterno de la menor Alicia Marie quién para la fecha del juicio había fallecido. Igualmente erró el Tribunal al pago de la misma cantidad a la sucesión de Elba Toledo por los sufrimientos y angustias mentales sufridos por ésta quién a la fecha del juicio había fallecido." Caso Núm. RE-89-44, Solicitud de revisión, págs. 5–19. Véase Alegato del Hospital de Nuestra Señora de la Guadalupe y de la Corporación Insular de Seguros, págs. 5–7.

No será necesario que se consignen determinaciones de hechos a los efectos de una apelación o revisión, pero a moción de parte, presentada a más tardar diez (10) días después de haberse archivado en autos copia de la notificación de la sentencia, el tribunal *podrá* hacer las determinaciones de hechos y conclusiones de derecho iniciales correspondientes, si es que éstas no se hubieren hecho por ser innecesarias, de acuerdo a la Regla 43.2, o *podrá* enmendar o hacer determinaciones adicionales, y *podrá* enmendar la sentencia de conformidad .... (Énfasis suplido.)

▉▉▉▉▉▉ De la letra clara de la citada disposición reglamentaria resulta obvio que el tribunal de instancia *no está obligado* a hacer determinaciones de hecho y de derecho adicionales luego de ser solicitadas por una parte, si es que éstas no proceden. La utilización de la palabra "podrá" le imparte un carácter discrecional para que el juez determine si las mismas proceden o no. En vista de ello, aplicamos el canon de hermenéutica consignado en la Sec. 14 de nuestro Código Civil, 31 L.P.R.A. sec. 14, a los efectos de que cuando "la ley es clara y libre de toda ambiguedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu". Véase *Col. Int'l Sek P.R., Inc. v. Escribá*, 135 D.P.R. 647, 660 (1994).

En el caso de autos, el juez de instancia realizó unas determinaciones de hecho detalladas, completas y concienzudas. Examinada la solicitud de determinaciones de hechos radicada por el Hospital, entendemos correcto el dictamen denegatorio del tribunal de instancia. Por otro lado, la alegación del Hospital, a los efectos de que las determinaciones adicionales solicitadas cambiarían o alterarían la conclusión en cuanto a la responsabilidad del Hospital respecto a lo acontecido, es totalmente inmeritoria.

En su *segundo* señalamiento de error, el Hospital alega que el foro de instancia incidió al determinar que la responsabilidad impuesta al Hospital está cubierta por la póliza de responsabilidad profesional hospitalaria al igual que bajo la cubierta de responsabilidad general civil. En cuanto al aspecto sustantivo de este señalamiento, nos ve-

mos forzados a abstenernos de discutir el mismo por una sola razón, a saber, que el contrato de seguro, ley entre las partes, no fue incluido como parte del apéndice a este recurso.[69] Por lo tanto, la parte recurrente —el Hospital— no nos ha puesto en posición de expresarnos al respecto.

En su *tercer* señalamiento de error, el Hospital alega que el antiguo Tribunal Superior incidió al determinar que el "doctor" Bengoa actuó en forma negligente. A la fecha en que ocurrieron los hechos del caso ante nuestra consideración, el "doctor" Roberto Bengoa era empleado del Hospital y se desempeñaba como *medical clerk* o asistente médico. T.E. de 9 de diciembre de 1987, pág. 198. Él había sido contratado por la referida institución hospitalaria como médico, pero no tenía licencia para practicar la medicina en Puerto Rico. Según surge de su propio testimonio, él había tomado la reválida de Medicina y había fracasado. Íd., pág. 195. Su trabajo en el Hospital consistía en hacer historiales médicos y exámenes físicos de los pacientes recluidos en los pisos tres (3) y cinco (5) del Hospital (íd., pág. 199), y recibía una remuneración de cinco dólares ($5) por cada paciente que examinaba. Las intervenciones con los pacientes las efectuaba la mayor parte del tiempo sin supervisión alguna de un médico autorizado a ejercer la Medicina. Íd., pág. 200.

Surge del récord médico que el 15 de noviembre de 1981, el día antes de la operación, Alicia Marie fue examinada en el Hospital por el "doctor" Bengoa quien le practicó un examen físico completo diagnosticándole una tonsilitis y una adenoiditis. Este diagnóstico se hizo constar en el récord de Alicia Marie. Sin embargo, de la prueba desfilada en instancia surgen varias inconsistencias en cuanto a lo señalado en el referido récord. En el récord, el "doctor"

---

[69] La solicitud de revisión radicada por el Hospital recurrente tan sólo cuenta con tres (3) apéndices, a saber: (1) la Sentencia de 28 de noviembre de 1988; (2) la Moción solicitando determinaciones de hecho adicionales a tenor con la Regla 43.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III, y (3) la Orden del tribunal de instancia de 16 de diciembre de 1988 y notificada el 20 de diciembre de 1988.

Bengoa informa que la niña estaba en la unidad de cuidado intensivo a cargo de la doctora Zayas cuando él la examinó. Esta aseveración es inconsistente con la prueba desfilada, ya que ésta demostró que cuando la niña fue ingresada en la mañana del 15 de noviembre de 1981, le fue asignada la habitación 404 del Hospital y que, por lo tanto, era imposible que la niña se encontrara en intensivo cuando el "doctor" Bengoa la examinó. Es un hecho ineludible que la niña fue trasladada al área de intensivo al día siguiente luego de la operación cuando surgió el incidente. Al igual que lo entendió la juez de instancia, somos del criterio que la referida inconsistencia se debe a que el "doctor" Bengoa no efectuó reporte alguno el día del examen de la niña, ni lo apuntó en el récord médico hasta fecha posterior.[70]

Estas inconsistencias nos hacen pensar que el récord de Alicia Marie pudo haber sido alterado posteriormente y que tanto el "doctor" Bengoa como el Hospital fueron negligentes por haber hecho y permitido anotaciones alteradas en el récord. Sin embargo, faltas en el cuidado al mantener los récord médicos de por sí no implican negligencia. A estos efectos, en *Pérez Cruz v. Hosp. La Concepción*, ante, págs. 731–732, dispusimos lo siguiente:

> "[e]n el pasado hemos reprobado con preocupación la laxitud en el mantenimiento del récord médico. Hemos de insistir. Ello mengua su efectividad como instrumento útil para informar con exactitud el cumplimiento de las órdenes del médico, y como fuente de referencia para la evaluación del tratamiento, la atención y cuidado administrado[s] al paciente. *López* v. *Hosp. Presbiteriano, Inc.*, supra, págs. 216–217. Más aún, hemos atribuido consecuencias jurídicas a dicha omisión "[e]n vista de la falta casi total de credibilidad que nos merecen los récords presentados en evidencia; en vista de que algunos de ellos fueron alterados; ...éste es un caso en el cual corresponde

---

[70] A su vez, cabe enfatizar el hecho de que las hojas del récord en cuestión con la información incorrecta aparecen firmadas también por el doctor Menéndez. Según la prueba, quedó establecido que el doctor Menéndez no visitó el Hospital ni vio a la niña en esa fecha, sino que la vio por primera vez el 16 de noviembre de 1981, cuando ésta ya estaba en el quirófano.

hacer con respecto al hospital [una] inferencia de negligencia que hace aplicable la regla de *res ipsa loquitur"*. *Oliveros* v. *Abréu*, 101 D.P.R. 209, 230 (1973). *La falta de dichas anotaciones en el récord no necesariamente constituye negligencia per se. Sin embargo, dicha omisión puede ser un factor a considerarse en la credibilidad que el médico merezca respecto al tratamiento que dio al paciente. Reyes* v. *Phoenix Assurance Co.*, 100 D.P.R. 871, 880–881 (1972). (Énfasis suplido.)[71]

Por su parte, es por todos harto conocido que para que prospere una causa de acción por daños y perjuicios bajo el Art. 1802 del Código Civil, ante, deben concurrir tres requisitos, a saber: (1) daño; (2) acción u omisión culposa o negligente, y (3) nexo causal entre el daño y la referida acción u omisión culposa o negligente. *J.A.D.M.* v. *Centro Com. Plaza Carolina*, 132 D.P.R. 785 (1993); *Hernández* v. *Fournier*, 80 D.P.R. 93, 96 (1957). En los casos de alegada impericia médica, la parte demandante viene en la obligación de establecer mediante preponderancia de la prueba que el tratamiento médico ofrecido por el demandado, o la ausencia de proveer el tratamiento indicado y correcto, fue el factor que con mayor probabilidad ocasionó el daño sufrido por el paciente. *Rodríguez Crespo* v. *Hernández*, ante, pág. 650; *Ríos Ruiz* v. *Mark*, ante; *Cruz* v. *Centro Médico de P.R.*, 113 D.P.R. 719, 744 (1983); *Zambrana* v. *Hospital Santo Asilo de Damas*, 109 D.P.R. 517, 521 (1980). Debe mantenerse presente, además, que la relación de causalidad, entre el daño y el acto negligente, no se establece a base de una mera especulación o conjetura. *Ramos, Escobales* v. *García, González*, 134 D.P.R. 969 (1993).

En vista de los señalamientos antes expuestos, resulta forzoso concluir que el "doctor" Bengoa incurrió en unas actuaciones dudosas. Sin embargo, para poder imponerle responsabilidad por sus acciones, la parte demandante tenía que probar la existencia de un nexo causal entre las

---

[71] Véase, además, *Rodríguez Crespo* v. *Hernández*, 121 D.P.R. 639, 661 (1988).

actuaciones del "doctor" Bengoa y el daño sufrido por la niña. En otras palabras, según lo exige el Art. 1802 del Código Civil, ante, había que establecer que la actuación del "doctor" Bengoa fue la que con mayor probabilidad ocasionó el daño.

Luego de un análisis de la prueba y del testimonio del referido médico, entendemos que el examen médico efectuado por el "doctor" Bengoa, su diagnóstico y las inconsistencias en el récord médico ocasionadas por él en nada contribuyeron al daño sufrido por Alicia Marie. En vista de que la parte demandante no probó que el examen que le hizo el "doctor" Bengoa a la niña fue el factor que con mayor probabilidad causó el daño sufrido, no podemos imponer responsabilidad al "doctor" Bengoa y, por lo tanto, no prospera la causa de acción en su contra bajo el Art. 1802 del Código Civil, ante. *Desde este aspecto*, le asiste la razón al Hospital recurrente.

No obstante esta determinación, somos del criterio que el Hospital sí fue negligente en la atención y cuidado médicos prestados a Alicia Marie y al incumplir su obligación de mantener en forma adecuada sus facilidades físicas y equipo médico necesarios. Primeramente, procede que reconozcamos que nuestro derecho vigente exige que los hospitales ejerzan el cuidado y las medidas previsoras que un "hombre prudente y razonable" desplegaría ante determinadas circunstancias y que ofrezcan a sus pacientes la atención médica que su condición requiera. *Márquez Vega v. Martínez Rosado,* 116 D.P.R. 397 (1985); *Crespo v. H.R. Psychiatric Hosp., Inc.,* 114 D.P.R. 796, 800 (1983); *López v. Hosp. Presbiteriano, Inc.,* 107 D.P.R. 197 (1978); *Oliveros v. Abréu,* ante; *Hernández v. La Capital,* 81 D.P.R. 1031, 1037–1038 (1960). Para determinar cuál ha de ser esta atención, puede servir de índice la práctica generalmente reconocida por la propia profesión médica. *Crespo v. H.R. Psychiatric Hosp., Inc.,* ante.

A su vez, cabe señalar que " 'el Art. 1802

[antes aludido] gira inevitablemente en torno a la función de previsión del individuo, como factor determinante de su responsabilidad con su congénere' ". (Énfasis suprimido.) *Rivera Pérez v. Cruz Corchado*, 119 D.P.R. 8, 18 (1987). "Claro está, esto no quiere decir, que la persona esté obligada a prever todos los posibles riesgos que puedan concebirse en una determinada situación, pues prácticamente se convertirá entonces en una responsabilidad absoluta." *Pacheco v. A.F.F.*, ante, pág. 300. "El deber de previsión no se extiende a todo peligro imaginable que concebiblemente pueda amenazar la seguridad ... sino a aquel que llevaría a una persona prudente a anticiparlo." *Hernández v. La Capital*, 81 D.P.R. 1031, 1038 (1960). Véase *Soc. de Gananciales, etc. v. Presbyterian Hosp.*, 88 D.P.R. 391 (1963). El hospital será responsable si ocurre un daño que en las circunstancias particulares del caso pudo razonablemente haberse previsto y evitado. *Hernández v. La Capital*, ante; *Lozada v. E.L.A.*, 116 D.P.R. 202, 215 (1985).

▮ Por su parte, en *Lozada v. E.L.A.*, ante, pág. 213, discutimos la responsabilidad de los hospitales por faltar al deber de tener determinado equipo médico. A esos efectos, señalamos lo siguiente:

> ... Aunque aspiramos al ideal de excelencia en la práctica de la medicina, la determinación de lo que constituye negligencia, por la posesión o carencia de equipo, necesariamente se nutre de diversos factores. Esta fórmula se explica, porque al "fijar la norma debemos y queremos ser justos y razonables. No vamos a exigir requisitos y condiciones que hagan imposible la práctica de la medicina en Puerto Rico o que hagan económicamente prohibitivos los servicios médicos". *Oliveros v. Abréu*, 101 D.P.R. 209, 226 (1973).
>
> Para evaluar en el caso de autos si existía el deber del Estado de poseer un equipo de arteriografía en el Departamento de Urología del Hospital Regional —que es la premisa cardinal en que basó el foro de instancia la responsabilidad— como lugar donde se realizaban biopsias renales, *debemos considerar ese deber configurado en el contexto de la figura de la previsibilidad, y en el elemento rector que la complementa: la razonabilidad. Esta a su vez se nutre de factores adicionales*

*tales como onerosidad, apremio, recursos, y sobre todo, el reco-
nocimiento y aceptación de alternativas por la profesión médica.*
(Énfasis suplido.)

Remitiéndonos al caso de autos, nos preguntamos si
—en vista de la jurisprudencia antes expuesta— era *previ-
sible* una situación como la ocurrida a Alicia Marie, a sa-
ber, complicaciones con la administración de una anestesia
y si, dentro de ese cuadro fáctico, era *razonable* exigir al
Hospital tener el *equipo básico vital* para atender una
emergencia de esta índole. *Contestamos ambas interrogan-
tes en la afirmativa.* Luego de un análisis concienzudo de la
evidencia testifical y pericial que consta en autos, somos
del criterio que surge claramente que en el Hospital de la
Guadalupe no había el equipo vital en los quirófanos, en
especial aquel equipo necesario para efectuar cirugías y
atender situaciones de emergencia en niños. *Según quedó
establecido, el equipo que no estaba disponible en el quiró-
fano en cuestión no era uno de tipo sofisticado ni especiali-
zado de poco uso, sino uno básico que debe estar disponible
en todas las salas de operaciones de los hospitales.* Además,
adquirir el equipo no era una inversión muy costosa según
lo demostró la prueba presentada. Veamos.

A estos efectos, según lo declarado por la doctora San-
taella, la máquina utilizada en el quirófano B para brindar
la anestesia a Alicia Marie no tenía el aditamento indis-
pensable para determinar si el paciente estaba recibiendo
el oxígeno necesario. T.E. de 15 y 16 de diciembre de 1987,
págs. 34–37. Sobre este particular, el doctor Matta —perito
anestesiólogo de la parte demandante— opinó que la utili-
zación de una máquina de anestesia desprovista de un
analizador de oxígeno es un riesgo tan grande que consti-
tuye "una barbaridad" y es inconcebible que se use una
máquina bajo esas circunstancias. T.E. de 15 y 16 de di-
ciembre de 1987, pág. 587.([72]) A su vez, la doctora Santaella

---

([72]) A su vez, el *Dr. Belisario Matta* —quien tiene una subespecialidad en cui-
dado intensivo— explicó al foro de instancia lo que es un récord de anestesia y cuál

testificó que en el referido quirófano no había un desfibrilador, instrumento necesario para atender una situación de emergencia de paro cardíaco como la acontecida en el caso de autos. Tampoco había el equipo para medir la presión arterial de la niña, ni para determinar la adecuada perfusión de los órganos vitales. T.E. de 15 y 16 de diciembre de 1987, pág. 43. En su declaración en la silla testifical, la doctora Santaella admitió que de haber tenido disponible el equipo adecuado, ella hubiese tenido la oportunidad de detectar y atender mejor la situación de emergencia que se le presentó a la niña. Íd., págs. 187–190.(⁷³)

Por otro lado, coincidimos con el tribunal de instancia en que quedó establecido que el referido Hospital tenía pleno conocimiento de que las máquinas utilizadas en los quirófanos eran rudimentarias y deficientes. *Esto, ya que la propia doctora Santaella testificó que había reportado al doctor González y al director médico del Hospital desde el*

---

es su importancia. Indicó que lo más importante de dicho récord es la anotación en secuencia cronológica de todo lo que sucede durante el procedimiento de anestesia y enfatizó la importancia de mantener un récord adecuado, veraz y que refleje exactamente lo que sucede durante todo el proceso de anestesia. Confrontado con la hoja de anestesia que se preparó en relación al accidente de Alicia Marie, señaló en ella las siguientes fallas: (1) la hoja no contiene o refleja la cantidad de halotano, ni la proporción de halotano y oxígeno que se utilizó en la paciente; (2) lo anotado en la gráfica de la hoja de anestesia no guarda relación cronológica con lo anotado en la columna a su derecha, donde se explica el contenido de la gráfica; (3) las incongruencias entre la gráfica y su columna explicativa son de tal naturaleza que mientras la gráfica demuestra que la niña tuvo latidos cardíacos que fluctuaron entre sesenta (60) y doscientos veinte (220) pulsaciones por minuto, en la columna de comentarios se informa que la niña sufrió un paro cardíaco y ello requirió masajes cardíacos, y (4) mientras la gráfica refleja latidos de doscientos diez (210) pulsaciones por minuto, en la columna de comentarios se informa que en esos momentos se administró adrenalina, que es un medicamento para estimular y aumentar los latidos cardíacos.

En opinión del doctor Matta, si una situación de arresto cardíaco no es manejada correctamente, se producen problemas de oxigenación en la sangre, los cuales conducen a un periodo de anoxia cerebral. De prolongarse ese estado de anoxia por más de tres (3) a cinco (5) minutos, se produce un edema cerebral que se traduce en daño cerebral irreversible, tal como ha ocurrido a Alicia Marie. Concluyó que para haberse producido el daño cerebral severo que sufrió Alicia Marie, ésta tuvo que haber estado sin oxígeno o adecuada oxigenación definitivamente y con certeza médica por más de cinco (5) minutos.

(⁷³) Según consta de la sentencia de instancia, ninguna de las partes demandadas pudo explicar a satisfacción del tribunal el por qué se perpetuó y se mantuvo el uso de equipo inadecuado en los quirófanos del Hospital de la Guadalupe. Véase la Determinación de Hecho Núm. 32 de la sentencia de instancia.

*año 1979, en repetidas ocasiones, la necesidad de tener disponible en los quirófanos el equipo necesario para atender situaciones de emergencia surgidas durante la administración de una anestesia.* T.E. de 15 y 16 de diciembre de 1987, pág. 24. El doctor González admitió en la silla testifical que sí había recibido quejas de la doctora Santaella sobre la falta de equipo. Íd., pág. 450. El tribunal de instancia adjudicó credibilidad al testimonio de la doctora Santaella. Nosotros *no* intervendremos a nivel apelativo con dicha determinación de hecho, y adjudicación de credibilidad, ya que no existe error manifiesto, pasión, prejuicio o parcialidad. *Sánchez Rodríguez v. López Jiménez*, ante; *Pérez Cruz v. Hospital de la Concepción*, ante.

Acorde con nuestra jurisprudencia vigente, si el Hospital conocía de la deficiencia de equipo, su responsabilidad era actuar como un "hombre prudente y razonable". De así haber actuado, debió haber previsto que de no adquirir el equipo necesario, podría surgir un estado de emergencia que no podría ser atendido adecuadamente por no tener los instrumentos necesarios para brindar ayuda a un paciente en crisis. Por lo tanto, somos del criterio que el daño que se le causó a Alicia Marie fue en gran parte producido por la falta de equipo necesario para atender a la niña antes y después de que le surgió el paro cardíaco. Concluimos que el Hospital fue negligente al no tener el equipo necesario. En vista de lo antes expuesto, la parte demandante probó los elementos necesarios para imponer responsabilidad al Hospital bajo el Art. 1802 del Código Civil, ante.

## VII

*Discusión de los errores señalados por el doctor Ferdinand Menéndez*

El tribunal de instancia determinó que el doctor Menéndez, otorrinolaringólogo, incurrió en negligencia porque

sus actuaciones para con la pequeña Alicia Marie se apartaron de las normas reconocidas de la mejor práctica de la medicina.[74] No estando conforme con la determinación del tribunal de instancia, el doctor Menéndez sometió ante nos solicitud de revisión señalando cuatro (4) errores.[75] Básicamente cuestiona la imposición de responsabilidad por lo ocurrido a Alicia, el grado de la misma y la cuantía concedida a los recurridos.[76]

En su primer señalamiento de error el doctor Menéndez se.cuestiona si la operación a que se sometió la menor Alicia Marie estaba de tal manera contraindicada por las autoridades médicas que el efectuarla constituyó impericia médica. *Contestamos en la afirmativa.*

----

[74] En su Conclusión de Derecho Núm. 5 en la sentencia, la juez de instancia manifestó lo siguiente en relación con las actuaciones del doctor Menéndez:

"... en ningún momento y durante las visitas en que la niña fue llevada a su oficina, le tomó un historial completo, no le hizo un examen físico minucioso y simplemente confió en el referido del doctor Hidalgo. Tampoco se comunicó con éste en forma alguna para conocer el historial médico de Alicia Marie y su condición física dando por sentado, negligentemente, que en la niña se reunían los criterios médicos pediátricos necesarios para llevarle a cabo una operación de las amígdalas y de adenoides.

"El Dr. Menéndez reconoció como autoridad en el campo de su especialidad, el Tratado *"Otorrinolaringology" de Paparella.* (Paparella & Shumrick, Vol. 3, págs. 296–301, W.B. Saunders Co., edición 1973) (Exhibit IX–Parte Demandante). En la silla testifical admitió que conforme a dicho Tratado, no estaban presentes las indicaciones absolutas para la referida operación." Caso Núm. RE-89-45, Sentencia del Tribunal Superior, págs. 106–107.

[75] El Dr. Ferdinand Menéndez levantó los siguientes señalamientos de error cometidos por el tribunal de instancia:

"A. ... si la operación a que se sometió la menor Alicia Marie Santos Blás estaba de tal manera contraindicada por las autoridades médicas que el hacerla constituyera impericia profesional.

"B. ... si la causa próxima del problema que la niña Alicia Marie Santos Blás desarrolló durante el proceso de anestesia fue la intervención médica del cirujano.

"C. ... si el porciento de negligencia atribuido al Dr. Ferdinand Menéndez guarda proporción con la de los otros codemandados.

"D. ... [si l]os daños concedidos en este caso son excesivos y deben ser modificados." Caso Núm. RE-89-45, Solicitud de revisión, pág. 7. Véase Alegato del recurrente doctor Ferdinand Menéndez, pág. 7.

[76] De los autos surge que el doctor Menéndez otorgó un contrato de transacción por el cual optó por no continuar su defensa contra los recurridos y accedió a otorgar la cubierta de su seguro por la suma de cien mil dólares ($100,000) permaneciendo en el pleito a los fines de dirimir las acciones de nivelación con respecto a los demás codemandados. Véase la Sentencia objeto de revisión, págs. 107 y 124.

El recurrente doctor Menéndez *reconoció* como autoridad en cuanto a la otorrinolaringología el texto de *Paparella y Shumrick, op. cit.* T.E. de 2 a 5 de diciembre de 1987, pág. 322. El recurrente declaró que conforme a la referida obra, existen cinco (5) criterios absolutos y relativos para realizar una tonsilectomía. Íd., pág. 380. Además, *admitió* la existencia de varios otros criterios que contraindican dicha operación. De todos los criterios indicativos de la procedencia de la referida operación, el doctor Menéndez declaró en juicio que Alicia Marie presentaba tan sólo dos (2) de ellos, a saber, infecciones crónicas y obstrucción. Íd.

*No le asiste la razón.* De la evidencia presentada por el propio doctor Menéndez surge claramente —del citado texto de *Paparella*— que en niños en condiciones similares, como las que exhibía Alicia Marie, *la tonsilectomía era contraindicada.* Además, surge de su testimonio que él *nunca* examinó el récord médico de Alicia Marie *ni* realizó pruebas para corroborar la necesidad de la operación. El recurrente *nunca* se comunicó con el doctor Hidalgo, pediatra de la niña. Por lo tanto, él no tuvo el beneficio de conocer el cuadro médico completo que presentaba la niña para poderse cerciorar si la operación era lo más conveniente para ella y si el estado de salud de la niña era adecuado para someterla a una intervención quirúrgica. Esta omisión por parte del doctor Menéndez lo llevó a efectuar una operación contraindicada, demostrando a su vez que no actuó como un hombre prudente y razonable. No se cometió el error señalado.

## VIII

*Discusión de los errores señalados por más de un recurrente*

A continuación discutiremos los señalamientos de error formulados por más de un recurrente que, por su naturaleza, pueden ser discutidos en conjunto.[77]

La *doctora Santaella* y el *doctor González*, en sus señalamientos de error número *diez* (10) y *dos* (2), respectivamente, cuestionan la responsabilidad de Respiratory Care of P.R., Inc., una asegurada de la también compareciente Universal Insurance Company. Los recurrentes alegan que Respiratory Care of P.R., Inc. no es responsable porque ésta prestó el servicio de anestesia por medio de enfermeras graduadas competentes y porque la parte demandante no probó que Alicia Marie hubiese llegado al cuidado de esta entidad sin el daño que finalmente afectó su capacidad. Veamos.

De la prueba presentada ante el foro de instancia surge claramente que la empresa Respiratory Care of P.R., Inc. —controlada por el Dr. Frederick González— actuó negli-

---

[77] Los señalamientos de error que levantó la Administración del Fondo de Compensación al Paciente, que aún no hemos discutido porque también fueron traídos por otros recurrentes y los discutiremos en conjunto, son los siguientes:

"1. ... compensar a la demandante Ivelisse Blás Toledo en la suma excesiva de $800,00.00.

"2. ... compensar al demandante Luis Santos Colón en la suma excesiva de $300,000.

"3. ... compensar a Luis Edgardo Nieves Piñeiro en la suma de $50,000.

"4. ... compensar a Luis Santos Colón en al suma de $25,000 como heredero de Efraín Santos Rivera.

"5. ... compensar a Ivelisse Blás Toledo en la suma de $6,250.00 como heredera de doña Elba Toledo.

"6. ... condenar a los demandados al pago de honorarios de abogado.

"7. ... incluir en la solidaridad de la sentencia a la demandada Administración del Fondo de Compensación al Paciente, que forma parte del soberano.

"8. ... no hacer una determinación específica de hecho, habiéndosele solicitado, en el sentido de que la Administración del Fondo de Compensación al Paciente responde únicamente hasta el monto de su póliza y no puede ser condenada al pago de intereses ni honorarios de abogado." Caso Núm. RE-89-40, Alegato del recurrente demandado, pág. 2. Véase el Alegato de la recurrente Administración del Fondo de Compensación al Paciente, pág. 2.

gentemente al asumir el cuidado de Alicia Marie a pesar de no contar con el equipo necesario y el personal adecuado para proveer el cuido que ella necesitaba. Según surge de los autos, Respiratory Care of P.R., Inc. intervino con Alicia Marie en la sala de operaciones, *luego de ocurrido el incidente que ocasionó el daño irreversible a Alicia Marie*, y luego en la unidad de cuidado intensivo. T.E. de 15 y 16 de diciembre de 1987, págs. 159–161.

Según relatáramos anteriormente (en las págs. 284–285 de esta Opinión), luego de la crisis en el quirófano, la doctora Santaella dio órdenes de que se velara de cerca y se "monitoreara" su condición. Sin embargo, del récord médico de Alicia Marie se desprende que el personal de Respiratory Care of P.R., Inc. no cumplió a cabalidad dichas órdenes.

No obstante lo anterior, dichas actuaciones no guardan relación con el daño sufrido por la menor. Toda la prueba en este caso apunta hacia el hecho de que la menor sufrió el daño causado de forma irreversible en el quirófano. De haber podido ser ese daño agravado posteriormente, no se demostró. Por todo lo cual, concluimos que no procede imponer responsabilidad a Respiratory Care of P.R., Inc. y/o sus empleados por actos llevados a cabo posterior al daño causado a la menor.

El pediatra, *doctor Hidalgo*, y el otorrinolaringólogo, *doctor Menéndez*, hacen referencia, en sus señalamientos de error número *cinco* (5) y *tres* (3), respectivamente, al por ciento de negligencia atribuido a cada uno por el tribunal de instancia. En particular, el doctor Hidalgo cuestiona la corrección de la proporción de negligencia atribuida a él, quien no estuvo presente durante el incidente en el quirófano, en comparación con la adjudicada al doctor Menéndez, quien sí lo estuvo. El foro de instancia determinó que el doctor Hidalgo era responsable de veinte por ciento (20%) de la negligencia, mientras que al doctor Menéndez le impuso diez por ciento (10%) de negligencia.

De entrada aclaramos que, según consta de la sentencia de instancia, el por ciento de negligencia que se impuso al doctor Menéndez *no* fue por sus actuaciones al momento del incidente en el quirófano *y sí por sus omisiones negligentes anteriores a la operación que lo llevaron a tomar la decisión de operar a la menor a pesar de que la intervención quirúrgica estaba contraindicada.* Con relación al doctor Hidalgo, éste plantea que él no participó en la toma de decisión de operar a la niña o del lugar donde se iba a llevar a cabo la operación; y que tampoco ni se encontraba en el quirófano cuando ocurrió el incidente. En vista de ello, entiende que el tribunal de instancia erró al imponerle un veinte por ciento (20%) de responsabilidad por los daños sufridos por la menor. El referido galeno alega que a quien se le debió imponer dicho por ciento de negligencia era al doctor Menéndez ya que fue él quien tomó la decisión de operar a la niña.

Anteriormente en esta ponencia aludimos en detalle a las actuaciones negligentes del doctor Hidalgo. Entendimos, al igual que el tribunal de instancia, que de no haber sido porque el doctor Hidalgo firmó el *medical clearance* de Alicia Marie, ella probablemente no hubiese sido operada. Él conocía la condición médica delicada de la niña y sabía, o debió haber sabido, que la operación, según los criterios reconocidos por la pediatría, estaba contraindicada. Fue el referido doctor, con su falta de diligencia y omisión, quien desató la cadena de hechos que pusieron a la niña en el quirófano arriesgándola a recibir un daño. De haber ejercido su deber, *como portavoz de los intereses de la menor*, ésta no habría llegado a la sala de operaciones, pues el otorrinolaringólogo no habría señalado la operación sin la aprobación del referido pediatra.

Por su parte, anteriormente hicimos referencia a los actos negligentes del doctor Menéndez, a saber: no comunicarse con el pediatra de la niña para discutir el cuadro clínico de la niña y las alternativas de tratamiento para

tratar los síntomas de la menor. T.E. de 2 a 5 de diciembre de 1987, pág. 395. *El doctor Menéndez admitió que, según el texto de Paparella, la operación de la niña estaba contraindicada y admitió que nunca examinó el récord de Alicia Marie.* Además, admitió que —a pesar de haber hecho constar en el récord que había examinado a Alicia Marie— no lo hizo y testificó además que sabía que el "doctor" Bengoa no tenía licencia. También surge de la prueba que el doctor Menéndez era miembro de la facultad médica del Hospital y director del departamento de otorrinolaringología; *en relación con esta última función tenía, o debió haber tenido, conocimiento de la condición deficiente de las salas de operaciones y de la ausencia de equipo pediátrico en el mismo.* No obstante, programó la operación de Alicia Marie en el Hospital.

En vista de lo antes dispuesto, y de los pronunciamientos previos en esta sentencia sobre la negligencia de los doctores Hidalgo y Menéndez, somos del criterio que sus acciones negligentes contribuyeron, *en igual proporción*, a los daños sufridos por Alicia Marie y que, por lo tanto, ameritan una adjudicación por igual de *un quince por ciento (15%)* de responsabilidad a cada uno. Procede que se *modifique* la sentencia de instancia a estos efectos.

El pediatra, *doctor Hidalgo*, y los anestesiólogos Dres. *Frederick González y Gloria Santaella*, en sus señalamientos de error número *sexto, decimocuarto y octavo*, respectivamente, cuestionan la corrección jurídica de la determinación del foro de instancia de condenar a los demandados al pago de costas, honorarios de abogado e intereses presentencia.

La Regla 44.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, dispone, en lo pertinente, lo siguiente en relación con las costas y los honorarios de abogado:

*Regla 44.1 Las costas y honorarios de abogado*
 (a) *Su concesión.*—Las costas le serán concedidas a la parte a cuyo favor se resuelva el pleito o se dicte sentencia en apela-

ción, excepto en aquellos casos en que se dispusiera lo contrario por ley o por estas reglas. Las costas que podrá conceder el tribunal son los gastos incurridos necesariamente en la tramitación de un pleito o procedimiento que la ley ordena o que el tribunal, en su discreción, estima que un litigante debe reembolsar a otro.

. . . . . . . . . .

(d) *Honorarios de abogado.*—En caso que cualquier parte o su abogado haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta.

En el normativo caso de *Fernández v. San Juan Cement Co., Inc.*, 118 D.P.R. 713, 717–719 (1987), hicimos numerosas expresiones en torno a los honorarios de abogado y su procedencia. Procedemos a citar del mismo:

La imposición de honorarios de abogado es discrecional, *Raluan Corp. v. Feliciano*, 111 D.P.R. 598 (1981), pero la Regla 44.1(d) de Procedimiento Civil es clara en el sentido de que cuando una parte ha procedido con temeridad, el tribunal *deberá* imponerle en su sentencia el pago de una suma por concepto de honorarios de abogado. Determinada la existencia de temeridad, la condena de honorarios es imperativa. *Montañez Cruz* v. *Metropolitan Cons. Corp.*, 87 D.P.R. 38 (1962); *Ortiz* v. *Martorell*, 80 D.P.R. 544 (1958); *Castro* v. *Payco, Inc.*, 75 D.P.R. 63 (1953); *Font* v. *Pastrana*, 73 D.P.R. 247 (1952); *Hernández* v. *Caraballo*, 74 D.P.R. 29 (1952); *Stella* v. *Bonilla*, 65 D.P.R. 542 (1946).

. . . . . . . . . .

El concepto "temeridad" no está expresamente definido por la Regla 44.1(d) de Procedimiento Civil.
Un comentarista ha dicho que la "temeridad es una actitud que se proyecta sobre el procedimiento y que afecta el buen funcionamiento y la administración de la justicia. También sujeta al litigante inocente a la ordalía del proceso judicial y lo expone a gastos innecesarios y a la contratación de servicios profesionales, incluyendo abogados, con el gravamen a veces exorbitante para su peculio." H. Sánchez, *Rebelde Sin Costas*, 4(2) Boletín Judicial 14 (1982). (Cita omitida.)

El concepto "temeridad" ha sido ampliamente definido por nuestra jurisprudencia. En términos genera-

les, se considera temeraria toda aquella conducta que haga necesario un pleito que se pudo evitar, que lo prolongue innecesariamente o requiera a la otra parte efectuar gestiones innecesarias. *Torres Ortiz v. E.L.A.*, 136 D.P.R. 556 (1994); *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294 (1990); *Hawayek v. A.F.F.*, 123 D.P.R. 526 (1989); *Colondres Vélez v. Bayrón Vélez*, 114 D.P.R. 833 (1983); *Ins. Co. of P.R. v. Tribunal Superior*, 100 D.P.R. 405 (1972).[78]

El propósito de la imposición de honorarios de abogado en casos de temeridad es "establecer una penalidad a un litigante perdidoso que por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconveniencias de un pleito". *Fernández v. San Juan Cement Co., Inc.*, ante; *Soto v. Lugo*, 76 D.P.R. 444 (1954). Además, la imposición de honorarios de abogado, como la de interés presentencia, tiene como propósito disuadir la litigación innecesaria y alentar las transacciones mediante la imposición de sanciones a la parte temeraria para compensar los perjuicios económicos y las molestias sufridas por la otra parte. *Pérez v. Col. Cirujanos Dentistas* de *P.R.*, 131 D.P.R. 545 (1992); *Elba A.B.M. v. U.P.R.*, ante; *Ins. Co. of P.R. v. Tribunal Superior*, ante. De esta forma se viabiliza y garantiza la justa, rápida y económica solución del asunto ante la consideración del Tribunal.

En *Fernández v. San Juan Cement Co., Inc.*, ante, resumimos —citando jurisprudencia previa— las instancias bajo las cuales existe temeridad, a saber: (1) contestar una demanda y negar responsabilidad total, aunque se acepte posteriormente; (2) defenderse injustificadamente de la acción; (3) creer que la cantidad reclamada es

---

[78] Véanse, además: *Fernández v. San Juan Cement Co., Inc.*, 125 D.P.R. 294 (1990); *San Antonio v. Jiménez & Fernández, Sucrs.*, 63 D.P.R. 215, 220 (1944); *Ortiz v. Viera*, 59 D.P.R. 358 (1941); *McCormick v. Vallés*, 55 D.P.R. 226, 233 (1939); *Stella Vda. de Ortiz v. Corte*, 41 D.P.R. 635 (1930).

exagerada y que sea esa la única razón que se tiene para oponerse a las peticiones del demandante sin admitir francamente su responsabilidad, pudiendo limitar la controversia a la fijación de la cuantía a ser concedida; (4) arriesgarse a litigar un caso del que se desprendía prima facie su responsabilidad, y (5) negar un hecho que le conste es cierto a quien hace la alegación.

Ahora bien, en cuanto a la cuantificación de los honorarios de abogado por los tribunales de instancia, establecimos en *Corpak, Art Printing v. Ramallo Brothers*, 125 D.P.R. 724, 738 (1990), que éstos

> ... pueden tomar en consideración factores tales como la naturaleza del litigio, las cuestiones de derecho envueltas [sic] en el mismo, la cuantía en controversia, el tiempo invertido, los esfuerzos y actividad profesional que hayan tenido que desplegarse, y la habilidad y reputación de los abogados envueltos [sic], *Serrano Vda. de Cartagena v. Lugo Ramírez*, 83 D.P.R. 300, 303 (1961); *Pan American v. Tribunal Superior*, 100 D.P.R. 405, 420 (1972); *Veve v. Municipio de Fajardo*, 18 D.P.R. 770, 771 (1912) —deberá mantenerse presente que el grado o intensidad de la conducta temeraria o frívola es el criterio o factor determinante y crítico que tienen que tomar en consideración dichos tribunales al determinar la cuantía de los honorarios de abogado a imponerse a la parte perdisiosa que ha actuado con temeridad o frivolidad .... (Énfasis suprimido.)

En vista de la doctrina antes expuesta, es preciso determinar si los demandados —excepto la Administración del Fondo de Compensación al Paciente, sobre la cual nos expresaremos más adelante— en este caso procedieron con temeridad.

Luego de un análisis ponderado de la prueba, *somos del criterio que los demandados actuaron temerariamente*. Todos ellos sabían, o debieron haber sabido, que su negligencia contribuyó al daño causado a Alicia Marie y, de todas formas, la negaron, realizaron descubrimiento de prueba, obligaron a la parte demandante a realizar el mismo y a litigar extensamente su caso. Además, los demandados re-

currentes, según consta de la prueba de autos, negaron y ocultaron hechos, dilataron los procedimientos, alteraron documentos y obligaron a la parte demandante a incurrir en gastos exorbitantes al litigar el caso por tantos años.

De otra parte, nuestra jurisprudencia reconoce que la imposición de costas es mandatoria contra la parte perdidosa. *Colondres Vélez v. Bayrón Vélez*, ante, pág. 839. En vista de esta jurisprudencia, y de la Regla 44.1 de Procedimiento Civil antes aludida, no hay duda de que el foro de instancia actuó correctamente al imponer a la parte perdidosa el pago de costas de la otra parte.

En relación con el interés legal, la Regla 44.3 de Procedimiento Civil, ante, dispone, en lo pertinente, que:

> (a) Se incluirán intereses al tipo que fije por reglamento la Junta Financiera de la Oficina del Comisionado de Instituciones Financieras y que esté en vigor al momento de dictarse la sentencia, en toda sentencia que ordena el pago de dinero, a computarse sobre la cuantía de la sentencia desde la fecha en que se dictó la sentencia y hasta que ésta sea satisfecha incluyendo costas y honorarios de abogado. El tipo de interés se hará constar en la sentencia.

> . . . . . . . .

> (b) El tribunal también *impondrá a la parte que haya procedido con temeridad el pago de interés* al tipo que haya fijado la Junta en virtud del inciso (a) de esta sección y que esté en vigor al momento de la sentencia desde que haya surgido la causa de acción en todo caso de cobro de dinero *y desde la radicación de la demanda, en casos de daños y perjuicios, y hasta la fecha en que se dicte sentencia a computarse sobre la cuantía de la sentencia,* excepto cuando la parte demandada sea el Estado Libre Asociado de Puerto Rico, sus municipios, agencias, instrumentalidades o funcionarios en su carácter oficial. El tipo de interés se hará constar en la sentencia. (Énfasis suplido.)

Luego de haber determinado que los demandados recurrentes fueron negligentes y temerarios, y en vista de la disposición antes transcrita, el tribunal de instancia actuó correctamente al imponerle a los demandados el pago de intereses presentencia desde la radicación de la demanda.

338

El pediatra, *doctor Hidalgo*;([79]) los anestesiólogos, *Dr. Frederick González*([80]) y la *Dra. Gloria Santaella*;([81]) el Hospital;([82]) el otorrinolaringólogo, Dr. Ferdinand *Menéndez*([83]), y la *Administración del Fondo de Compensación al Paciente*,([84]) cuestionan *la cuantía de las compensaciones* concedidas por el foro de instancia a los codemandantes por daños físicos, angustias y sufrimientos mentales. Antes de entrar en la discusión de estos errores, procede exponer las sumas que el tribunal de instancia condenó a los demandados a pagar solidariamente a los demandantes por daños físicos, angustias y sufrimientos mentales: (1) a la menor Alicia Marie la suma de quinientos mil dólares ($500,00); (2) a Ivelisse Blás Toledo, madre de la menor, la suma de ochocientos mil dólares ($800,000); (3) a Luis Santos Colón, padre biológico de la menor, la suma de trescientos mil dólares ($300,000); (4) a Edgardo Nieves Piñeiro, padrastro de la niña, la suma de cincuenta mil dólares ($50,000); (5) a la Sucesión de Efraín Santos Rivera —compuesta por su único y universal heredero Luis Santos Colón— padre biológico de la niña, la suma de veinticinco mil dólares ($25,000), por los sufrimientos y angustias mentales sufridos por Don Efraín Santos Rivera, abuelo de Alicia Marie, ya fallecido; (6) a la Sucesión de Elba Toledo compuesta por Ivonne Nieves Toledo e Ivelisse Haydee, Frankie Anthony y Francis Davis Blás Toledo la suma de veinticinco mil dólares ($25,000) por los sufrimientos y angustias mentales sufridos por Doña Elba, abuela materna de Alicia Marie.([85])

---

([79]) En su señalamiento de error número *siete*.

([80]) En sus señalamientos de error números *sexto, noveno, décimo, decimoprimero y decimotercero*.

([81]) En sus señalamientos de error números *cuarto y séptimo*.

([82]) En sus señalamientos de error números *quinto y sexto*.

([83]) En su señalamiento de error número *cuatro*.

([84]) En sus señalamientos de error números *uno, dos y tres*.

([85]) Las compensación concedida a cada una de las sucesiones por las angustias y sufrimientos mentales serán discutidas más adelante en el último señalamiento de error levantado por varios de los recurrentes.

Como hemos expresado en innumerables ocasiones, la gestión judicial de estimación y valoración de daños es una difícil y angustiosa, no existiendo un sistema mecánico que nos permita llegar a un resultado exacto en relación con el cual todas las partes queden satisfechas y complacidas. *Rodríguez Cancel v. E.L.A.*, 116 D.P.R. 443, 451 (1985); *Urrutia v. A.A.A.*, 103 D.P.R. 643 (1975). Hemos reconocido el hecho, en relación con esta difícil y angustiosa labor, que, de ordinario, los tribunales de instancia están en una mejor posición que los tribunales apelativos para evaluar la situación. Ello así, por cuanto éstos son los que tienen contacto directo con la prueba que a esos efectos presenta la parte que los reclama. *Publio Díaz v. E.L.A.*, 106 D.P.R. 854 (1978). Ahí la razón para la norma de abstención judicial. Es decir, que este Tribunal no intervendrá con la decisión que a ese respecto emitan los tribunales de instancia a menos que las cuantías concedidas sean ridículamente bajas o exageradamente altas. *Valldejuli Rodríguez v. A.A.A.*, 99 D.P.R. 917 (1971); *Urrutia v. A.A.A.*, ante. Además, la parte que ante este Tribunal solicita la modificación de las sumas concedidas a nivel de instancia, viene obligada a demostrar la existencia de las circunstancias que hacen meritorio el que se modifiquen las mismas. *Canales Velázquez v. Rosario Quiles*, 107 D.P.R. 757 (1978); *Rodríguez Cancel v. E.L.A.*, ante.

De entrada queremos aclarar el hecho de que estamos bien conscientes de los sufrimientos y las angustias mentales por las cuales los familiares de Alicia Marie han pasado durante los últimos años luego de tan trágico incidente. No hay duda de que los demandantes recurridos deben ser *compensados adecuadamente* por sus sufrimientos. Ello no obstante, somos del criterio, en vista de la doctrina antes expuesta y luego de un análisis ponderado de la prueba, *que debemos modificar varias de las compensaciones otorgadas por ser las mismas exageradamente altas. Urrutia v. A.A.A.*, ante. Veamos.

La prueba de daños presentada por los demandantes movió al foro de instancia a determinar que como cuestión de hecho se habían demostrado los siguientes daños que nosotros avalamos. Es un hecho no controvertido que Alicia Marie,[86] luego del incidente en el Hospital, quedó completamente desvalida y dependía total y absolutamente del cuido de sus familiares, especialmente de su madre, y que necesitaba atención especializada y supervisión continua durante todo el tiempo. Había que alimentarla cinco (5) veces al día, darle terapia física por lo menos tres (3) veces al día, manipulándole y masajeándole las piernas, brazos y cabeza, y había que virarla de posición cada cierto tiempo para que la piel no se ulcerara. Constantemente debía succionársele las secreciones nasales y la saliva y, además, tenía que ser bañada a diario y aseada cuantas veces fuera necesario. Alicia Marie no se movía, no oía, no veía, ni hablaba, sí sentía dolor, lo cual el foro de instancia pudo apreciar al ver dos (2) películas en las que se mostró cómo cada dos (2) días se le tenía que introducir por la nariz, hasta el estómago, un tubo nasogástrico por donde se le administraban los alimentos necesarios para su subsistencia. Según la prueba pericial presentada, aunque la niña no podía expresar su sufrimiento, lo padecía. Cuando sentía dolor, no podía manifestarlo, pero lloraba, se quejaba y su cuerpo lo resentía. El tribunal vio la película que presentaba la vida diaria de la niña y determinó que la menor sí sentía dolor y sufría físicamente. No intervendremos con esta determinación.

▮ La incomodidad física que su cuerpo sufría y el deterioro físico son daños reales. Los recurrentes nos solicitan que revoquemos la compensación concedida a la niña porque, según alegan, como su cerebro estaba muerto, ella

---

[86] Resumimos la prueba de los daños tomando en cuenta que, al momento de preparar esta sentencia, Alicia Marie ya había fallecido.

no entendía y no tenía conciencia del sufrimiento. Ellos alegan que su daño no es compensable porque ella tenía la capacidad de un recién nacido. También, argumentan que no se le pueden compensar daños mentales a Alicia Marie debido a su severo daño cerebral. Nada más lejos de la realidad. Quedó probado a nuestra satisfacción que Alicia Marie sufría y sentía dolor. Ahora bien, somos del criterio que la suma concedídale de quinientos mil dólares ($500,000) es una "exageradamente alta". *Rodríguez Cancel v. E.L.A.*, ante. *Consideramos procedente, por lo tanto, reducir la misma a la suma de doscientos cincuenta mil dólares ($250,000).*

En cuanto a los daños sufridos por Ivelisse Blás Toledo, el foro de instancia determinó que ésta había sufrido enormemente al ver a su hija de dos (2) años y nueve (9) meses —a quien quería entrañablemente— quedar de momento e inesperadamente, total y permanentemente incapacitada, en estado vegetativo, sin la más mínima esperanza de recuperación y con una expectativa de vida al dictarse la sentencia de instancia de diecinueve (19) años. Ivelisse quedó profundamente angustiada y sufría constantemente por la condición en que se encontraba su hija y por el futuro de ésta. Expresó al foro de instancia que todavía se cuestiona por qué los doctores Hidalgo y Menéndez sometieron a la niña a una operación contraindicada e innecesaria y por qué, hasta el presente, nadie le ha podido brindar una explicación de lo sucedido.

 Comprendemos cabalmente las angustias y los sufrimientos mentales sufridos por la señora Blás Toledo. No obstante, somos del criterio que la cuantía de ochocientos mil dólares ($800,000) otorgada a estos efectos por el tribunal de instancia es "exageradamente alta"; *ello, principalmente, en vista de lo resuelto en Riley v. Rodríguez de Pacheco*, 119 D.P.R. 762, 804–805 (1987). En el referido

caso expresamos, en torno a la determinación de daños, lo siguiente:

> ... al adjudicar daños estamos conscientes que el dolor humano (físico y espiritual) no es similar ni pecuniariamente cotizable. El dinero y el dolor "son bienes de tan distinta categoría que no cabe comparación. Pero si el dinero no es suficiente para reparar este tipo de daños, es preferible que la víctima reciba indemnización insuficiente a que no reciba ninguna. Por tanto, aunque el dinero no pueda ser parangonado con el dolor es posible proporcionar a la víctima una compensación que, sin llegar a devolverle lo perdido, le permita procurarse placeres y satisfacciones, psíquicas o mentales, aptas para atenuar el dolor sufrido." Ataz López, *op. cit.*, pág. 328. Tercero, llevados a sus extremos reales, los sufrimientos mentales y físicos son cuantificables al infinito. Sin unos límites razonables, la indemnización dejaría de tener la característica de resarcimiento para convertirse en una punitiva. *Rivera v. Rossi*, 64 D.P.R. 718 (1945). Valga aclarar que esta "interpretación no debe tomarse como menosprecio a la realidad y honestidad de [los] sufrimientos." *Pérez Cruz v. Hosp. La Concepción*, supra, pág. 739. Cuarto, al evaluar casos de mala práctica profesional médica, salvo aquellos basados en hechos intencionalmente culposos o dolosos, recordamos "que la mano que cura no alcanza el grado de agravio social de la mano que hiere". *Negrón v. Municipio de San Juan*, supra, pág. 381, opinión disidente del Juez Asociado, Señor Díaz Cruz. Quinto, la estimación de una compensación justa y razonable por los daños sufridos es tarea que constituirá un reto aun para un Salomón del Siglo XX." *Emotional Disability and Compensation, Traumatic Medicine & Surgery for the Attorney*, Washington, Ed. Butterworth, 1962, Vol. 6, pág. 82. La apreciación humana valorativa de elementos que no son ostensibles y visibles sino intangibles (emociones tales como dolor, alegría, tristeza, frustración, paz, tranquilidad del espíritu, honor y otras) no está exenta de cierto grado de especulación. Aspiramos a que toda adjudicación sea razonablemente balanceada, esto es, ni extremadamente baja como tampoco desproporcionalmente alta. *Urrutia v. A.A.A.*, 103 D.P.R. 643, 647–648 (1975). Y por último, hemos de evitar, en lo posible, que el resarcimiento de daños y perjuicios se convierta en una industria lucrativa forense en que los médicos y pacientes sean la materia prima. (Escolio omitidos.)

Considerando todos los factores involucrados y, luego de aplicar las expresiones antes señaladas al caso de autos,

modificamos la cuantía otorgada a la señora Blás Toledo. *Estimamos razonable la suma de cuatrocientos mil dólares ($400,000) en concepto de angustias mentales.*

En relación con las angustias mentales del Sr. Luis Santos Colón, padre biológico de la niña, entendemos que éste experimentó graves angustias y sufrimientos, al igual que su ex esposa, al ver a su hija en el estado de salud tan precario que quedó luego del incidente en el Hospital. Según la prueba desfilada, en los períodos de hospitalización, el señor Santos se mantuvo al lado de su hija. Luego de que fue dada de alta, éste la visitaba a diario, proveyéndole ayuda económica y apoyo moral a la madre y a los otros familiares. En la medida que le fuera posible, ayudaba con el cuido diario de la niña. No obstante, considerando que el señor Santos no residía en el mismo hogar que Alicia Marie y que éste no estaba involucrado totalmente y a cabalidad en el diario vivir y cuido de su hija, y sí reconociendo sus sufrimientos mentales, somos del criterio que la suma adjudicada en su favor de trescientos mil dólares ($300,000) es "exageradamente alta". *Entendemos que una suma de doscientos mil dólares ($200,000) se ajusta más a la realidad de los daños sufridos por este codemandante.*

En relación con el Sr. Edgardo Nieves Piñeiro, padrastro de Alicia Marie, somos del criterio que éste sufrió grandes sufrimientos al ver a Alicia Marie, a quien quería como una hija, en la condición que se encontraba luego del incidente y presenciar como ésta sufría en su diario vivir debido a su condición irreversible. El señor Nieves tenía una relación muy íntima con la niña, al extremo que ésta lo llamaba "Papi Luis". Al momento del incidente, el señor Nieves permaneció al lado de su esposa Ivelisse en todo momento. Por tener alguna experiencia en trabajo de hospitales, el señor Nieves fue el familiar a quien se adiestró para cuidar, asear y alimentar a la niña mientras Ivelisse estaba embarazada. Luego de ésta dar a luz, el señor Nieves entrenó a Ivelisse para él poder volver a su trabajo. El señor

Nieves Piñeiro, junto a su esposa Ivelisse, era quien daba el cuido diario a la menor y quien se ocupaba de que ésta recibiera la atención adecuada acorde con las órdenes médicas. En 1985, el señor Nieves e Ivelisse se divorciaron, pero esto no impidió que, en la medida que Ivelisse necesitara ayuda, éste se la brindara asistiéndola en las terapias y tratamientos. Por entender que la compensación adjudicada al Sr. Edgardo Nieves Piñeiro, padrastro de Alicia Marie, no es ni exageradamente alta ni ridículamente baja, no intervendremos con la misma. Acorde con la prueba desfilada en instancia, *se justifica plenamente la suma de cincuenta mil dólares ($50,000) que otorgó el tribunal de instancia al señor Nieves.*

■ Los anestesiólogos, *Dr. Frederick González y Dra. Gloria Santaella*, en sus señalamientos de error *octavo* y *tercero*, respectivamente, cuestionan la corrección de la compensación de treinta mil dólares ($30,000) concedida a la menor por el menoscabo de la habilidad para generar ingresos futuros. De entrada, cabe aclarar que los daños especiales tienen que ser alegados en la demanda porque, de lo contrario, se renuncian. Así lo requiere la Regla 7.4 de Procedimiento Civil, ante.[87] *Prado v. Quiñones*, ante; *Betances v. Autoridad de Transporte*, ante; *Tuya v. White Star Bus Line, Inc.*, ante. La pérdida de ingresos futuros es un daño especial y, por lo tanto, tiene que ser mencionado en la demanda para luego poder ser recobrado.[88] La parte demandante cumplió con este requisito al establecer en la alegación número sesenta (60) de su demanda que la menor Alicia Marie "experimentará pérdida de ingresos futuros por haber perdido toda capacidad de desarrollarse

---

[87] La Regla 7.4 de Procedimiento Civil, 32 L.P.R.A. Ap. III, requiere que "[c]uando se reclamen daños especiales, se detall[e] el concepto de las distintas partidas."

[88] Véase, además, H. Brau del Toro, *Daños y Perjuicios Extracontractuales*, San Juan, Pubs. J.T.S., 1986, pág. 433.

como persona, estudiar y convertirse en un ser productivo". Caso Núm. RE–89–45, Demanda enmendada, pág. 13.

En *Ruiz Santiago v. E.L.A.*, 116 D.P.R. 306, 310 (1985), reconocimos, por primera vez, la modalidad del lucro cesante llamada "menoscabo del potencial de generar ingresos". Esta se refiere a una persona que nunca había recibido un ingreso ni los recibía en el momento del acto dañoso. Tal es el caso en el que se causa incapacidad a un menor que no había recibido ingresos nunca, pero que tiene a su favor la presunción de que habría sido una persona de condiciones normales y que habría ganado lo que tal persona ganaría.[89] "La compensación no va dirigida a sustituir ingresos —porque no los hay— sino a indemnizar mediante una suma global el potencial frustrado de generarlos ante la realidad de ese daño." *Ruiz Santiago v. E.L.A.*, ante, pág. 317.

En el caso normativo de *Pate v. U.S.A.*, 120 D.P.R. 566, 572 (1988), reafirmamos lo establecido en *Ruiz Santiago v. E.L.A.*, ante, y resumimos su doctrina como sigue:

> En esa ocasión nos pronunciamos en el sentido de que las complicaciones inherentes que conllevaban la cuantificación y determinación de una compensación adecuada en tales instancias, no podían servir de obstáculo en nuestra principal función de hacer cumplida justicia. Después de todo, "aun tratándose de un menor se ha destruido como ser humano su potencial de ingresos." *Ruiz Santiago* v. *E.L.A.*, supra, pág. 314. Indicamos que este tipo de daño "es una lesión identificable, con marcada probabilidad." Íd., pág. 317. Para fines de moldear el diseño remedial, enumeramos varios factores que deberían tomarse en consideración al fijarse la cuantía. A tal efecto, en "esa función judicial estimativa y ante la ausencia de un historial previo de actividad retribuida, deben tomarse en cuenta el [*status*] del menor al momento de la incapacidad y su proyección futura razonable. Son factores apropiados, tales como: tipo de núcleo familiar, grado de estabilidad del hogar, edad, condición de salud física y mental previa, inteligencia, su disposición, educación alcanzada, hábitos de estudio, habilidad en la escuela, ta-

---

[89] Véase Brau del Toro, *op. cit.*, pág. 433.

lento, intereses específicos, "entrenamientos y destrezas desarrolladas, grado de madurez y experiencia".

En vista de la doctrina antes expuesta, en el caso de autos la niña Alicia Marie tenía derecho a reclamar por el referido menoscabo, ya que las acciones de los demandados le privaron de su potencial de generar ingresos futuros al dejarla permanentemente incapacitada. La prueba desfilada en juicio, particularmente el testimonio de los padres de la niña, demostró que ésta tenía la expectativa de ser una persona productiva. Además, de acuerdo a nuestras expresiones en *Ruiz Santiago v. E.L.A.*, ante, pág. 311, Alicia Marie, al igual que todos los niños, " 'tiene a su favor todas las presunciones de que será una persona de condiciones normales y en condiciones de ganar lo que dicha persona ganaría' ". (Énfasis suprimido.)

De la sentencia que emitiera la juez de instancia surge claramente que ella tomó en consideración los factores que esbozamos anteriormente y que, de acuerdo con los mismos, llegó a su determinación de conceder a Alicia Marie la suma de treinta mil dólares ($30,000) por el menoscabo sufrido en su potencial de generar ingresos. Estimamos que dicha suma es justa y adecuada reflejando correctamente el menoscabo del potencial de generar ingresos de Alicia Marie. *En vista de ello, no intervendremos con la adjudicación de la referida cuantía.* No se cometió el error señalado.

La *Administración del Fondo de Compensación al Paciente*[90] (en adelante la A.F.C.P.), en su octavo señala-

---

[90] La Administración del Fondo de Compensación al Paciente advino a la luz pública en virtud de la aprobación por nuestra Asamblea Legislativa de la Ley Núm. 74 de 30 de mayo de 1976, conocida como la Ley de Responsabilidad Médico-Hospitalaria, 26 L.P.R.A. ant. sec. 4101 *et seq.* Su propósito es proveer una cubierta de responsabilidad profesional médico-hospitalaria que cubra aquella porción de cada reclamación de daños por culpa o negligencia médica en el cuido y tratamiento de pacientes en Puerto Rico que exceda los límites de responsabilidad financiera requerida a los profesionales e instituciones dedicadas al cuidado de la salud. 26 L.P.R.A. sec. 4105(1)(a). Véase *Sánchez Millet v. E.L.A.*, 118 D.P.R. 106, 110 (1986).

El Código de Seguros y, consecuentemente, la Asociación de Suscripción Conjunta y la Administración del Fondo de Compensación al Paciente fueron suprimidos

miento de error, cuestiona la corrección de la decisión del tribunal de instancia de incluir a la A.F.C.P. —que alegadamente forma parte del Estado— como responsable solidaria en la sentencia, cuando de acuerdo a la póliza vigente, la A.F.C.P. sólo responde hasta el máximo de setenta y cinco mil dólares ($75,000), exenta del pago de intereses y de honorarios de abogado.

La A.F.C.P. otorgó una póliza de responsabilidad profesional de médicos (Póliza Núm. AFCP 1401) bajo la cual figura como asegurada la Dra. Gloria Santaella. La aludida póliza estaba vigente al momento en que ocurrieron los actos negligentes en cuestión, ya que la misma cubría el período del 15 de octubre de 1981 al 30 de junio de 1982.[91] En la referida póliza se establecieron como límites de responsabilidad setenta y cinco mil dólares ($75,000) por cada reclamación y ciento cincuenta mil dólares ($150,000) por agregado.[92] La A.F.C.P. se comprometió a través de la póliza a pagar a nombre del asegurado "aquellas sumas que el asegurado venga legalmente obligado a pagar debido a

---

por la Sec. 3 de la Ley Núm. 4 de 30 de diciembre de 1986 (26 L.P.R.A. sec. 4101n). En lo pertinente, se dispuso lo siguiente:

"Todo procedimiento pendiente ante la Administración del Fondo de Compensación al Paciente o ante cualquier agencia o tribunal, a la fecha de aprobación de esta ley [30 de diciembre de 1986], y que se haya iniciado conforme a las disposiciones del Capítulo 41 de la Ley Núm. 77 de 19 de junio de 1957, enmendada, que se deroga en la Sección 2 de esta ley, se continuará tramitando por el Comisionado de Seguros *hasta que recaiga una determinación final de acuerdo con las leyes y reglamentos en vigor a la fecha en que tales procedimientos se hayan presentado o iniciado.* A estos efectos el Comisionado de Seguros tendrá todos los poderes, facultades y prerrogativas de los cuales goza la Administración del Fondo de Compensación al Paciente." (Énfasis suplido.) Disposiciones transitorias, 26 L.P.R.A. sec. 4101n.

En vista de lo antes citado, resolvemos este señalamiento de error de acuerdo con las disposiciones vigentes de la AFCP al momento en que se radicó la demanda.

[91] Los hechos del caso ante nuestra consideración ocurrieron el 16 de noviembre de 1981.

[92] Estos límites de responsabilidad están acorde con los máximos establecidos por el Art. 41.050 del Código de Seguros, ante. Véase según enmendado y vigente a la fecha en que se suscribió la referida póliza. Dicho artículo disponía que "[e]n ningún caso la Administración [del Fondo de Compensación al Paciente] será responsable por una cantidad en exceso de setenta y cinco mil (75,000) dólares por reclamación y ciento cincuenta mil (150,000) dólares por agregados ...". Art. 41.050 de la Ley Núm. 55, ante. Véase *Ramos v. Hosp. Sub-Regional de Aguadilla*, 111 D.P.R. 744, 747 (1981).

cualquier daño ocasionado durante el período de la póliza a un paciente por error, omisión, culpa o negligencia como consecuencia de servicios profesionales brindados o que debieron haber sido brindados por el asegurado". A su vez, la A.F.C.P. se obliga a pagar todas las costas impuestas sobre el asegurado en el curso de un pleito defendido por la A.F.C.P. Bajo el acápite "Límite de responsabilidad de la AFCP" se aclara que "[a] pesar del número de reclamaciones o pleitos (sic) traídos como resultado de daño ocasionado, *la AFCP será responsable únicamente hasta la cantidad especificada en el renglón de la Sección Límites de Responsabilidad de las declaraciones*". (Énfasis suplido.)

Luego de un análisis de la póliza en cuestión,[93] entendemos que la misma es clara en sus disposiciones y que dicha póliza cumple con los requisitos establecidos en el Código de Seguros relacionados con el seguro de responsabilidad profesional médico-hospitalaria. 26 L.P.R.A. sec. 4101 *et seq.* Siguiendo lo expuesto en la póliza y según el compromiso de la A.F.C.P. de pagar en caso de una actuación negligente del asegurado, somos del criterio que la A.F.C.P. respondía por las actuaciones negligentes de la doctora Santaella en el caso de autos, *pero tan sólo hasta el límite estipulado de setenta y cinco mil dólares ($75,000).*

En relación al pago de intereses sobre la sentencia, el Art. 41.070(5) del Cap. 41 del Código de Seguros, Ley Núm. 74 de 30 de mayo de 1976 (26 L.P.R.A. ant. sec. 4107(s))[94] dispone que "[l]a Administración [del Fondo de Compensación al Paciente] no quedará sujeta al pago de intereses sobre sentencias que le afecten". Ante esta disposición clara de la ley, somos del criterio que la A.F.C.P. no tiene que pagar intereses presentencia. Por lo tanto, el tribunal de instancia *erró* en este aspecto al imponerle la res-

---

[93] La póliza de seguro fue presentada por la A.F.C.P. y admitida por el tribunal de instancia como *Exhibit* I.

[94] La referida ley era la vigente al momento que ocurrieron los hechos del caso de autos y cuando se dictó la sentencia.

ponsabilidad del pago de los referidos intereses junto con los otros demandados.

El anestesiólogo, *Dr. Frederick González*, en su cuarto señalamiento de error, cuestiona la determinación del tribunal de instancia de que existe relación causal entre su negligencia y el daño sufrido por los demandantes. Como mencionamos anteriormente, para que prospere una causa de acción por daños y perjuicios bajo el Art. 1802 del Código Civil, ante, deben concurrir tres (3) requisitos, a saber: (1) daño; (2) acción u omisión culposa o negligente, y (3) *nexo causal entre el daño y la referida acción u omisión culposa o negligente. J.A.D.M. v. Centro Com. Plaza Carolina*, ante; *Hernández v. Fournier*, ante.[95]

En cuanto al doctor González, procede invocar, de entrada, la doctrina de la responsabilidad vicaria, según está dispuesta en el Art. 1803 de nuestro Código Civil, 31 L.P.R.A. sec. 5143. Esta se refiere a que la responsabilidad impuesta por el Art. 1802 del Código Civil, ante, no tan solo se extiende a los actos u omisiones propias, sino a los de aquellas personas por las cuales se debe responder, a saber, los dueños de empresas por sus empleados en ocasión de sus funciones, entre otros. *Vélez Colón v. Iglesia Católica*, 105 D.P.R. 123 (1976).

En las determinaciones de hecho del caso de autos, el tribunal de instancia concluyó que el doctor González era el patrono de la doctora Santaella al momento en que ocurrió el incidente.[96] Luego de analizar la prueba, somos del criterio que esta determinación no adolece de prejuicio, pasión o parcialidad; no intervendremos con la misma. En vista de ello, y tomando en consideración que la doctora Santaella fue negligente según lo establecimos anterior-

---

[95] Véanse: *Rodríguez Crespo v. Hernández*, ante; *Ríos Ruiz v. Mark*, 119 D.P.R. 816 (1987); *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719 (1983); *Zambrana v. Hospital Santo Asilo de Damas*, 109 D.P.R. 517 (1980).

[96] Véase la Determinación de Hecho Núm. 66 de la sentencia de instancia, pág. 77.

mente, el doctor González responde *vicariamente* por sus actuaciones.

Por otro lado, ya en cuanto a las *propias actuaciones* del doctor González, éste como jefe del Departamento de Anestesiología del Hospital, y bajo un contrato de exclusividad, sabía o debió haber sabido que en la sala de cuidado intensivo no había el equipo adecuado para responder ante una emergencia que ocurriera durante la administración de una anestesia. Tampoco había el equipo necesario para vigilar niños en el estado en que se hallaba Alicia Marie. Debido a que el doctor González era el jefe del referido Departamento, él tenía o debió haber tenido conocimiento de que no era la primera vez que surgía un incidente parecido al de Alicia Marie en el Hospital. Es necesario recordar que la doctora Santaella había indicado en varias ocasiones al doctor González que en la sala de operaciones se necesitaba equipo de emergencia para atender a los niños. Ante esta realidad era previsible, de haber un incidente con un niño en el quirófano, que no se podría ofrecer el cuidado adecuado, lo cual agravaría los daños.

■ Los anestesiólogos, *doctora Santaella y doctor González*, el *Hospital*,([97]) y la *A.F.C.P.*([98]) cuestionan la validez de la compensación por concepto de sufrimientos y angustias mentales concedida por el foro de instancia a las sucesiones de los abuelos de Alicia Marie, el Sr. Efraín Santos Rivera y la Sra. Elba Toledo. Éstos fallecieron antes de la celebración del juicio y no pudieron testificar sobre tales daños. No les asiste la razón. En *Vda. de Delgado v. Boston Ins. Co.*, 101 D.P.R. 598 (1973), reconocimos que el derecho a reclamar por los sufrimientos físicos y morales constituye un bien patrimonial transmisible a los herederos por la muerte de su causante. Por su parte, en *Consejo de Titulares v. C.R.U.V.*, 132 D.P.R. 707 (1993), reiteramos

---

([97]) En sus señalamientos de error números *seis, cinco y siete*, respectivamente.

([98]) En sus señalamientos de error números *cuatro y cinco*.

varias expresiones del caso antes aludido. A estos efectos y citando el referido caso de *Vda. de Delgado v. Boston Ins. Co.*, ante, págs. 605–606, expresamos que:

Habiendo tomado carta de naturaleza en nuestro ordenamiento civil el precepto y la práctica de convertir a indemnización pecuniaria adecuada el dolor y sufrimiento humano originado por el acto negligente, *se le impartió carácter patrimonial al derecho a reclamarla,* y representando ese derecho o causa de acción un bien valorable en dinero con normas de estimación o valoración que han ganado la aprobación ética de la sociedad contemporánea, *no hay razón legal ni moral para excluirlo* del acervo o caudal relicto transmitido por el causante a sus herederos. (Énfasis en el original y escolio omitido.)

Luego de estas expresiones, concluimos, en el caso de *Junta de Condómines v. C.R.U.V.*, ante, págs. 732–733, "que el derecho del causante a obtener indemnización por los daños sufridos es un bien transmisible a los herederos, 'pues en definitiva es un derecho de crédito perfectamente transmisible al amparo de las reglas generales que regulan la transmisibilidad de los derechos' ". (Énfasis suprimido.) Según surge de la prueba presentada por los demandantes (T.E. de 18 a 21 de diciembre de 1987, págs. 58–60), los abuelos de Alicia Marie, quienes fallecieron durante el litigio y antes del juicio, sufrieron graves angustias al ver a su nietecita en el estado que se encontraba luego del incidente. A su vez, los abuelos sufrieron como miembros de la familia de Alicia Marie y la prueba demostró que no sólo vieron la condición a la que fue reducida la menor, sino que padecieron grandes angustias mentales al ver a sus hijos luchar por mantener viva a su hija y buscar un remedio a su condición. Posteriormente, éstos cooperaron en el cuido y sostén de Alicia Marie mediante trabajo y apoyo económico.

A pesar de que los abuelos fallecidos no testificaron acerca de sus angustias y sufrimientos, somos del criterio que los herederos de éstos probaron —*mediante evidencia indirecta a través de sus propios testimonios a esos efec-*

*tos*— que dichos causantes sí experimentaron el dolor y los sufrimientos que causaron los recurrentes a su familia en general. Por lo tanto, probaron que las compensaciones concedidas sí procedían.[99]

En vista de la jurisprudencia antes aludida en torno a la transmisibilidad a los herederos del derecho de recobrar por los sufrimientos y angustias mentales de su causante, resolvemos que el tribunal a quo actuó correctamente al conceder una compensación a cada una de las sucesiones de los abuelos fallecidos de Alicia Marie. El tribunal de instancia determinó como razonable la suma de veinticinco mil dólares ($25,000); no intervendremos con dicha cuantía ya que la misma está justificada por la prueba.

Por los fundamentos antes expuestos, se *modifica* la sentencia, a los efectos antes indicados, dictada por el entonces Tribunal Superior, Sala de San Juan, y así modificada, se confirma la misma. Se devuelve el caso a dicho foro para procedimientos ulteriores consistentes con lo aquí resuelto.

*Se dictará sentencia de conformidad.*

La Juez Asociada Señora Naveira de Rodón concurrió en parte y disintió en parte. Concurrió ya que entiende que la determinación de negligencia es correcta, y disintió ya que no modificaría las cuantías concedidas a nivel de instancia, las cuales entiende razonables. El Juez Asociado Señor Hernández Denton confirmaría la sentencia recurrida en su totalidad, ya que no modificaría las cuantias concedidas

---

[99] En *Moa v. E.L.A.*, 100 D.P.R. 573, 587 (1972), en lo pertinente concluimos que:

"... como el dolor y sufrimiento no pueden ser objeto de cotización, para determinar el valor razonable de tales daños morales *es preciso que el reclamante, en cada caso, aporte los factores de evidencia necesarios para evaluarlos justa y adecuadamente,* probando que no se trata de una simple pena pasajera, sino que, *en alguna medida apreciable, el reclamante realmente quedó afectado en su salud, bienestar y felicidad,* como dijimos en *Ramos Rivera v. E.L.A.*, 90 D.P.R. 828, 831 (1964)." (Énfasis suplido.)

por el tribunal de instancia. El Juez Asociado Señor Negrón García se inhibió.